PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 18-1428

_____

UNITED STATES OF AMERICA

v.

DWIGHT D. HENLEY,
                              Appellant

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 2-15-cr-00199-001)
District Judge: Honorable Mark R. Hornak

_____

Submitted February 5, 2019
Before: HARDIMAN, SCIRICA, and RENDELL, *Circuit
Judges*.

(Filed: October 29, 2019)

Scott W. Brady
Donovan J. Cocas
Laura S. Irwin
Office of United States Attorney
700 Grant Street
Suite 4000
Pittsburgh, PA 15219
    *Attorneys for Appellee*

Giuseppe G.C. Rosselli
Suite 107
660 Lincoln Avenue
Pittsburgh, PA 15202
    *Attorney for Appellant*

————————

OPINION OF THE COURT

————————

HARDIMAN, *Circuit Judge*.

Dwight Henley appeals an order of the District Court denying his motion to suppress evidence. Henley preserved his right to appeal that issue by entering conditional guilty pleas to possessing a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1) and possession with intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1). The question presented is whether the Commonwealth of Pennsylvania violated Henley's Fourth Amendment rights when it searched his house while he was on parole. Because reasonable suspicion supported the search, we will affirm.

I[1]

In March 2012, Henley was a parolee subject to supervision by the Pennsylvania Board of Probation and Parole. A parole agent with over twenty years' experience, Joyce Douglass, was assigned to Henley. According to Agent Douglass, Henley first did "really well" on parole while living with his sister in a supportive environment, App. II 109, and Douglass had a "pretty decent relationship" with him. App. II 111. But Douglass observed a "change in attitude" as Henley "became more secretive" and engaged in conduct that led Douglass to ask her supervisor to search Henley and his home for evidence of drug trafficking. App. II 111.

For starters, Douglass noticed Henley began associating with several former and current parolees suspected of drug dealing. Henley also violated his parole conditions by moving residences twice without the required prior notice. He moved out of his sister's home and into a home on Pine Alley in Clairton, Pennsylvania, that he reportedly bought for $1.00 from his brother Quienty, who was on parole as well. Henley later moved to a home on Park Avenue in Clairton he bought after reportedly selling the Pine Alley home for $800.00 to

---

[1] The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291. We review de novo the District Court's legal determination that reasonable suspicion supported the search. *Ornelas v. United States*, 517 U.S. 690, 691 (1996). Because the suppression motion was denied, we view the facts in the light most favorable to the Government. *United States v. Myers*, 308 F.3d 251, 255 (3d Cir. 2002).

Jarron Bell, who himself was a parolee supervised by Douglass and was under investigation by the FBI for heroin trafficking. Douglass learned Henley was associating with Bell when she tried to visit Henley at the Pine Alley address, but was greeted by Bell, who pretended to be a guest even though he had bought the home from Henley. Henley admitted lying to Douglass about the property transfer to cover for Bell.

Douglass's observations on other home visits likewise sparked concern. She observed motorcycle club attire and a photograph of Henley with the club, whose members included other parolees. She caught Henley in more lies and another violation of parole conditions. In late spring 2013, Agent Douglass twice attempted a home visit, but Henley had traveled without permission to the club's bike week at the beach. Henley falsely reported that he had gone fishing just outside the permitted area. In response, Douglass placed him on electronic monitoring for a month. On a March 2014 home visit, Douglass noticed Henley's front door had been kicked in. Henley informed her someone broke into his home, which raised a red flag because it suggested to Douglass that someone was looking for drugs, guns, or money. Finally, during an October 31, 2014 home visit, Douglass smelled the "really strong" odor of a "large amount of marijuana," which she called "skunk weed," coming from the enclosed porch. App. II 137-139.

Another issue that troubled Douglass was Henley's apparent income in relation to his lawful employment. At the beginning of his parole, Henley changed employers twice, increasing his wage to $11.00 per hour at MPW Industrial Services. According to his boss, Henley "work[ed] as much overtime as he possibly could," App. II 121, "trying to better himself." App. II 110. But MPW later reported to Douglass that

Henley chose to work less, rejecting available work he sought before and "all of a sudden, he just seemed to be working a couple days a week." App. II 121. Despite this reduced schedule, Henley paid several thousand dollars in fines, when previously he had paid little. Douglass also took notice that: (1) Henley owned three motor vehicles, a motorcycle, and a boat; (2) Henley appeared at the parole offices with a "fair amount of cash," though not enough in her estimation to document, App. II 191; and (3) "quite a bit of money" was spent to remodel and furnish Henley's Park Avenue home. App. II 132.

In late December 2014, MPW terminated Henley's employment because he punched a co-worker, and multiple sources reported to Douglass that Henley's brother Quienty brought a handgun to the altercation. Yet Henley told Douglass that his employer fired him because he accidentally ate a marijuana brownie and failed a drug test.

From October 2013 until early 2015, Douglass received reports that Henley was selling marijuana, that he was paying his subordinates with heroin, and that his associates, (including Bell) were selling drugs.

On February 23, 2015, after receiving approval from her supervisor, Douglass and two other Pennsylvania parole agents (John Sartori, Jr. and Ronald Fine) entered Henley's home through an open door without a warrant, searched his person, and searched his residence. Officers found and seized the following indicia of drug trafficking: over $2,000 in cash; over 800 grams of marijuana in a large plastic bag, a vacuum-sealed package, and several individual packages; scales; a marijuana grinder; a .45 caliber pistol and ammunition; and three cell

phones. During the search, Henley made incriminating statements as well.

A federal grand jury returned a three-count indictment charging Henley with drug trafficking and firearm offenses. Henley moved under Rule 12(b)(3)(C) of the Federal Rules of Criminal Procedure to suppress the evidence obtained from the search, contending it violated the Fourth Amendment. After an evidentiary hearing, the District Court denied the motion, holding the agents possessed reasonable suspicion necessary to support the search. Consistent with his conditional guilty pleas, Henley filed this appeal challenging the search.

## II

Henley claims Douglass's suspicion that he was dealing drugs rested on "nothing more than stale speculation premised upon irrelevant innuendo." Henley Br. at 5. In support of his appeal, Henley relies on various Pennsylvania court decisions concerned with state constitutional violations. Because this case involves a federal prosecution, however, we must determine what the Fourth Amendment demands of the challenged search. *United States v. Rickus*, 737 F.2d 360, 363-64 (3d Cir. 1984). At the same time, we recognize that state law may inform the contours of the government intrusion, both in terms of the legitimate state interests and the parolee's diminished expectation of privacy. *See Samson v. California*, 547 U.S. 843, 851–52 (2006).

## A

The touchstone of the Fourth Amendment is reasonableness, so we determine the constitutionality of a search "by assessing, on the one hand, the degree to which it

intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *United States v. Knights*, 534 U.S. 112, 118–19 (2001) (quoting *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999)).

As a parolee, Henley's liberty was subject to certain restrictions. *See Samson*, 547 U.S. at 850–51 & n.2 (parolees are more like prisoners than probationers). The state interest in parolees like Henley is two-fold: (1) that they successfully complete the term of . . . parole with integration "back into the community" while (2) protecting the public from their conduct as individuals who are considered more likely to engage in criminal conduct than the ordinary member of the community. *Id.* at 849. "[T]he balance of these considerations requires no more than reasonable suspicion to conduct a [warrantless] search of a [parolee's] . . . house." *Knights*, 534 U.S. at 121; *see United States v. Baker*, 221 F.3d 438, 444 (3d Cir. 2000) (justification applies with perhaps even greater force to parolees given judgment that parolee needed incarceration).

## B

Henley claims the applicable standard for the search is reasonable suspicion. The Government counters that under the Supreme Court's decision in *Samson*, the Fourth Amendment requires no suspicion to justify a warrantless parole search, even if Pennsylvania law would. We read *Samson* differently than the Government.

Before *Samson*, the Supreme Court in *Knights* held constitutional the warrantless search of a probationer on reasonable suspicion where the search was a condition of probation of which the probationer was aware. 534 U.S. at 121.

In *Samson*, the Supreme Court considered the California legislature's determination that it was not feasible to require reasonable suspicion to search parolees because of their vast numbers and high recidivism rates. California concluded that a reasonable suspicion requirement "would undermine the State's ability to effectively supervise parolees and protect the public from criminal acts of reoffenders." 547 U.S. at 854.

*Samson* answered in the affirmative a question left open in *Knight*—"whether a *condition of release* can so diminish or eliminate a released prisoner's reasonable expectation of privacy that a suspicionless search by a law enforcement officer would not offend the Fourth Amendment." *Samson*, 547 U.S. at 847 (emphasis added). The *Samson* Court upheld California's decision to impose as a condition of parole that the individual be subject to search "by a parole officer or other peace officer at any time of the day or night, with or without a search warrant and with or without cause." 547 U.S. at 846 (citing CAL. PENAL CODE § 3067(a) (West 2000)). So *Samson* suggests that a State may make such a condition part of its parole system without violating the Fourth Amendment. 547 U.S. at 855 ("That some States and the Federal Government require a level of individualized suspicion is of little relevance to our determination whether California's supervisory system is drawn to meet its needs and is reasonable, taking into account a parolee's substantially diminished expectation of privacy."). Our reading of *Samson* and a faithful reading of our decision in *United States v. Baker* requires that we reject the Government's proposition.

Unlike in *Samson*, here neither the Pennsylvania legislature nor Henley's conditions of release subject him to search at any time or for any reason. In fact, reasonable suspicion is required under Pennsylvania law. 61 PA. CONS.

STAT. § 6153.[2] For that reason, in *United States v. Baker*, we held that although a Pennsylvania parolee consent form providing for search without a warrant waived the warrant requirement, it did not provide for suspicionless searches. 221 F.3d at 448. We determined the search in *Baker* violated the Fourth Amendment because it was unsupported by reasonable suspicion or a waiver of Pennsylvania's reasonable suspicion requirement for a parole search. *Id.* at 449. *Baker* accords with *Samson*, so we adhere to it. In sum, Henley's search required reasonable suspicion because neither a statute nor a condition of parole provides that he was subject to search without suspicion.

### III

We turn now to apply the "flexible" test of reasonableness. *United States v. Ramos*, 443 F.3d 304, 309 (3d Cir. 2006). "Balancing the totality of the circumstances is the 'general Fourth Amendment approach' used to assess the reasonableness of a contested search." *United States v. Mitchell*, 652 F.3d 387, 403 (3d Cir. 2011) (quoting *Knights*, 534 U.S. at 118). We determine whether reasonable suspicion exists by context and "commonsense," *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000), mindful that it is something less than what is "required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable," *Alabama v. White*, 496 U.S. 325, 330 (1990). Thus, an officer needs only "a particularized and objective

---

[2] Section 6153(b), PA. CONS. STAT. ANN. (2009), provides for search of parolees in accordance with its provisions. Section 6153(d) provides a parole agent may conduct a personal or property search on reasonable suspicion. 61 PA. CONS. STAT. ANN. § 6153(d)(1)-(2).

basis for suspecting legal wrongdoing," *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotations omitted).

Parole agents, like other law enforcement officers, should "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Arvizu*, 534 U.S. at 273 (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)). In the comparable probation context, the Supreme Court has explained that

> we deal with a situation in which there is an ongoing supervisory relationship—and one that is not, or at least not entirely, adversarial—between the object of the search and the decisionmaker.
>
> In such circumstances it is both unrealistic and destructive of the whole object of the continuing [] relationship to insist upon the same degree of demonstrable reliability of particular items of supporting data, and upon the same degree of certainty of violation, as is required in other contexts. In some cases—especially those involving drugs or illegal weapons—the [] agency must be able to act based upon a lesser degree of certainty than the Fourth Amendment would otherwise require in order to intervene before [the individual] does damage to himself or society. The agency, moreover, must be able to proceed on the basis of its entire experience with the probationer, and to assess probabilities in the light of its knowledge of his life, character, and circumstances.

10

*Griffin v. Wisconsin*, 483 U.S. 868, 879 (1987) (footnotes omitted).[3]

In this appeal, we must determine whether the facts and circumstances known to a veteran parole agent who supervised a parolee convicted of drug crimes would warrant an agent of reasonable caution to have a particularized basis for believing evidence of criminality would be found during the February 23, 2015 search. *Arvizu*, 534 U.S. at 273. We hold they would.

In response to the Government's argument, Henley challenges information in isolation. We address each of Henley's challenges, but we do so by considering (as we must) the totality of the circumstances.

Henley first insists that the conduct Douglass cited in support of her belief he had returned to drug dealing was susceptible to innocuous explanation. According to Henley, the fact that he owned multiple vehicles and a boat, bought and sold houses, and suddenly came up with thousands of dollars while turning away lawful work should not have raised concerns to Douglass. Henley suggests that he might have sold a vehicle before buying the next one, the boat was nothing impressive, and the houses were of modest value (apparently worth only $1). His association with the motorcycle club was

---

[3] In this same vein, Pennsylvania law provides for the supervisory agent/parolee relationship that "[s]upervision practices shall reflect the balance of enforcement of the conditions of parole and case management techniques to maximize successful parole completion through effective reentry to society." 61 PA. CONS. STAT. ANN. § 6153(a).

a positive thing that should have been of no concern to Douglass—despite the involvement of other parolees suspected of drug crimes. And how could Douglass hold against him his having paid the fines he was legally obliged to pay?

Henley's approach would replace "reasonable suspicion" based on the totality of the circumstances with a "no room for doubt" that a parolee is engaged in criminal conduct standard. Such a test would severely impede the laudable and legitimate goals of parole supervision: successful re-entry and protecting the public. Evaluating factors in isolation and then according "no weight" to conduct susceptible of "innocent explanation" departs "sharply" from the Supreme Court's teachings. *Arvizu*, 534 U.S. at 274. The Court has stated that "innocent behavior frequently will provide the basis for a showing of probable cause." *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983). Even more so for the lesser showing of reasonable suspicion. *See United States v. Sokolow*, 490 U.S. 1, 8-9 (1989) (conduct consistent with innocent travel in combination amounted to reasonable suspicion of a drug enforcement officer). For that reason, Douglass did not have to "rule out the possibility of innocent conduct," *Arvizu*, 534 U.S. at 277, when considering Henley's activities.

And then there is Henley's access to marijuana and its discovery at his home during a search for evidence of drug trafficking. Henley incredibly claims that his veteran parole agent failed to show she had experience to determine whether what she smelled on the home visit in October 2014 was marijuana, or if the smell was just a skunk infestation. Douglass's experience supervising parolees convicted of drug crimes easily meets the bar for our evaluation of her assessment. Moreover, "[i]t is well settled that the smell of

marijuana alone, if articulable and particularized, may establish not merely reasonable suspicion, but probable cause." *Ramos*, 443 F.3d at 308.

Henley challenges as too stale to support reasonable suspicion for the February 23, 2015 search that (1) he suffered a break-in back in March 2014 and (2) Douglass detected the marijuana odor in October 2014. He protests (ironically) that his circumstances did not involve "the hallmarks of an actual investigation into narcotics dealing" because there were no drug buys or wiretaps. Henley Br. at 11. We reject the notion that absent a full-scale or ongoing drug trafficking investigation, staleness presents an insurmountable bar to a later parole search.

As for staleness, "[t]he likelihood that the evidence sought is still in place depends on a number of variables, such as the nature of the crime [or parole violation], of the criminal, of the thing to be seized, and of the place to be searched," *United States v. Tehfe*, 722 F.2d 1114, 1119 (3d Cir. 1983); *see United States v. Harvey*, 2 F.3d 1318, 1322 (3d Cir. 1993). The passage of time "loses significance" when the evidence sought relates to protracted or ongoing criminality. *United States v. Urban*, 404 F.3d 754, 774 (3d Cir. 2005); *see Tehfe*, 722 F.3d at 1119.

*United States v. Ritter*, 416 F.3d 256 (3d Cir. 2005), is instructive. That case involved aerial observation and seizure of marijuana plants at a property plus two anonymous tips over seven months later reporting marijuana growing there. We found that evidence provided probable cause to get a warrant to search the property despite the time between the observation and the tips. *Id.* at 262-63. Considering only the October 2014

home visit and the February search, the gap in this appeal is half the time at issue in *Ritter*.

Henley also questions that no property search occurred at the time of the October 2014 home visit. But justification for an earlier search that did not occur does not vitiate lawful justification to conduct a later search. Moreover, any claimed staleness disappeared in the face of the broader circumstances giving Douglass reason to believe that Henley was trafficking drugs.

As to the ongoing reports of criminal activity to his parole officer, Henley challenges them as unworthy of consideration because Douglass did not detail the who, what, where, and when of the reports. We disagree.

It's true Douglass provided little detail, but she did testify that reports were ongoing. She also said the reports were about Henley, not just someone consistent with his identity. And they specified he was selling drugs and paying subordinates with heroin.

"Tipster" cases, whether involving probable cause or reasonable suspicion determinations, focus on the tip's indicia of reliability. *Alabama v. White* found an anonymous tip reliable enough for a *Terry* stop where portions of the tip were corroborated, such as the unpredictable movements of the person identified in it. 496 U.S. at 327. We require more for the tip relied on by law enforcement to justify probable cause, than for reasonable suspicion. *Alabama v. White*, 496 U.S. at 330. And under the instruction of *Griffin* and *Samson*, the requisite reliability of a tip to support the weight of reasonable suspicion for a *Terry* stop seems too high a bar when considering the potentially recalcitrant parolee and a parole

search. Our approach to the reasonableness of a parole agent relying on information relayed by others, even if not law enforcement, even if anonymous, and even if not intrinsically reliable, bends heavily towards the twin goals of parole supervision with reasonableness of the intrusion as the paramount concern.

In considering the inherent nature of supervision, we acknowledge that parole officers may consider general reports in carrying out their duties—in fact, that information is their stock in trade.[4] We reject Henley's contention that the reports—which Douglass found to corroborate her concerns— provide little to no support for reasonable suspicion in the parole context.

*Griffin* supports our approach. The Court there found "reasonable grounds" for a probation search when a detective called a probation supervisor and stated "there were or might be guns" in the probationer's home. 483 U.S. at 871. Nothing further to support a search—just an "unverified tip from an unknown source" to a detective then relayed to probation. *Id.* at 887 (Blackmun, Jr., dissenting).

---

[4] *Samson* recognized that a parolee's incentive to conceal criminality justifies an intensive system of supervision. 547 U.S. at 855. The delicate balance of this system—at the same time seeking a transition into society while protecting the public from the same individual—requires parole officers to act on "reports," "tips," or "information" that in other contexts might seem too thin.

The Court explained

> we think it reasonable to permit information provided by a police officer, whether or not on the basis of firsthand knowledge, to support a probationer search. . . .[P]olice may be unwilling to disclose their confidential sources to probation personnel. For the same reason, and also because it is the very assumption of the institution of probation that the probationer is in need of rehabilitation and is more likely than the ordinary citizen to violate the law, we think it enough if the information provided indicates, as it did here, only the likelihood ("had or might have guns") of facts justifying the search.

*Griffin*, 483 U.S. at 879–80 (1987). Thus, *Griffin* endorses the adequacy of generalized information from an unknown source of evidence of a crime in a parole/probation context.

We also find it significant that the Supreme Court in *Griffin* did not assess traditional tip reliability factors—presumably because it involved a probationer. In view of Henley's drug trafficking history, the ongoing reports (more than the one report in *Griffin*) would resonate with a reasonable parole agent's concerns about his activities. Under *Griffin* the reports themselves would provide reasonable suspicion for a parole search, whether or not relayed through other law enforcement.

Viewing the totality of the facts presented here, Henley's parole status and his criminal history with drugs made him more likely to commit a drug trafficking crime than the public. He also violated his conditions of parole by failing

to ask the permission required of his parole agent. Another factor is the apparent disparity in Henley's income and his spending. Douglass learned of Henley's decreased interest in taking on work at MPW at the same time he exhibited an ability to pay thousands of dollars in fines and purchase vehicles, homes, repairs, and new furniture. All this suggested to Douglass that Henley had returned to drug trafficking to make money. The smell of a large amount of marijuana and the break-in of Henley's home also suggested an intruder seeking to access drugs, guns, and money in Henley's home. Finally, we acknowledge the ongoing reports to Douglass from October 2013 continuing up until the time of the search that Henley engaged in drug trafficking activity and his continued association with other parolees suspected of the same. These facts ineluctably show that a reasonably prudent parole agent in Douglass's shoes would suspect that Henley returned to drug trafficking and that evidence of it would be found during the February 23, 2015 search.

\*        \*        \*

The Commonwealth found evidence supporting Henley's conviction during a search supported by reasonable suspicion. Because no Fourth Amendment violation occurred, the District Court did not err when it denied Henley's motion to suppress. We will affirm the convictions and judgment of sentence.