# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

_____

## Case No. 18-1428

_____


## UNITED STATES OF AMERICA,

Appellee,

v.

## DWIGHT HENLEY

Appellant.

_____

## BRIEF FOR APPELLANT

_____

Appeal from the Judgment in a Criminal Case from the United States District Court for the Western District of Pennsylvania, at Criminal No. 15-199, The Honorable Mark R. Hornak, Entered on February 15, 2018

_____

Giuseppe GC Rosselli
Counsel for Appellant,
Dwight Henley

660 Lincoln Avenue
Suite 107
Pittsburgh, PA 15202
(412) 281-8008

# TABLE OF CONTENTS

Page

Table of Cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .i

Statement of Jurisdiction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

Statement of the Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

Statement of the Case  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Statement of the Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Statement of Related Cases and Proceedings . . . . . . . . . . . . . . . . . . . . . .12

Statement of Standard or Scope of Review . . . . . . . . . . . . . . . . . . . . . . . 12

Summary of Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

On February 23, 2015, parole officers searched Mr. Henley's home.  At the time of the search, the facts known to the officers did not support a reasonable suspicion belief that evidence of criminal activity or a probation violation was likely to be found in Mr. Henley's home. Accordingly, all evidence obtained as a result of the search should have been suppressed…………………………………………………..14

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27

Appendix, Volume I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Notice of Appeal………………………………App. Vol. I, Page 1

Order denying Suppression Motion…………...App. Vol. I, Page 2

Opinion under Review………………………...App. Vol. I, Page 3

Judgment in a Criminal Case…………………App. Vol. I, Page 26

Certificate of Compliance With Type-Volume
Limitation, Typeface Requirements and Type Style Requirements . . . . . . . . 29

Certificate of Bar Membership. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Certification of Identical Compliance of Briefs. . . . . . . . . . . . . . . . . . . . . . . 30

Certification of Virus Check . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .31

# TABLE OF CASES

Commonwealth v. Janda, 14 A.3d 147 (Pa. Super. 2011)…………………....19, 20

Commonwealth v. Novak, 335 A.2d 773(Pa. Super. 1975)………………...19, 23

Commonwealth v. Randolph, 151 A.3d 170, (Pa. Super. 2016)……………...22, 23

Commonwealth v. Wilson, 67 A.3d 736 (Pa. 2013)……………………………15

Griffin v. Wisconsin., 483 U.S. 868 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

Horton v. California, 496 U.S. 128 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Illinois v. Gates, 462 U.S. 213 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

Katz v. United States, 389 U.S. 347 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Maryland v. Macon, 472 U.S. 463 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

Ornelas v. United States, 517 U.S. 690 (1996) . . . . . . . . . . . . . . . . . . . . . . . 17

Sgro v. United States, 287 U.S. 206 (1932) …………………………………...18

Terry v. Ohio, 392 U.S. 1 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17, 21

United States v. Acosta, 965 F.2d 1248 (3rd Cir. 1992). . . . . . . . . . . . . . . . . . 14

United States v. Arvizu, 534 U.S. 266 (2002) . . . . . . . . . . . . . . . . . . . . . . . . .17

United States v. Baker, 221 F.3d 438 (3rd Cir. 2000). . . . . . . . . . . . . . . . 14,16,21,22

United States v. Brown, 448 F.3d 239 (3d Cir. 2006) . . . . . . . . . . . . . . . . . . . 18

United States v. Cortez, 449 U.S. 411 (1981)). . . . . . . . . . . . . . . . . . . . . . . .....17

United States v. Harold, 962 F.2d 1131 (3rd Cir. 1992). . . . . . . . . . . . . . . . . . .14

United States v. Harris, 482 F.2d 1115, 1119-1120 (3d Cir.1973)……………...20

United States v. Harvey, 2 F.3D 1318 (3rd Cir. 1993)…………………………18,19

United States v. Hill, 967 F.2d  902 (3rd Cir. 1992) . . . . . . . . . . . . . . . . . . . . 15

United States v. Johnson, 63 F.3d 242 (3rd Cir. 1995). . . . . . . . . . . . . . . . . . . . 18

United States v. Nazarok, 737 F.2d 360 (3rd Cir. 1984). . . . . . . . . . . . . . . . . .17

United States v. Perez, 280 318, 336 (3rd Cir. 2002).  . . . . . . . . . . . . . . . . . . . 12

United States v. Perminter, 2012 WL 273349 (W.D. Pa. 2012)……………....21, 25, 26

United States v. Salmon, 944 F.2d 1106 (3rd Cir. 1991). . . . . . . . . . . . . . . . . . 14

United States v. Strickland, 237 Fed.Appx. 773, (3rd Cir. 2007)………………….24

United States v. Williams, 124 F.3d 411, 420 (3d Cir. 1997)…………………….20

United States v. Yokshan, 431 Fed.Appx. 170 (3d Cir. 2011)……………………24

Wong Sun v. United States, 371 U.S. 471 (1963) . . . . . . . . . . . . . . . . . . . . . . 18


Statutes and Rules

18 U.S.C. § 922(g) …………………………………………………………..3

18 U.S.C. § 924(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

18 U.S.C. § 924(e) …………………………………………………………..3

18 U.S.C. § 3231 …………………………………………………………...1

18 U.S.C. § 3742…………………………………………………………….1

21 U.S.C. § 841 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

28 U.S.C. § 1291……..  . . . . . . . . . . . . . . . . . . ... . . . . . . . . . . . . . . . . . . . . …. .1
61 Pa.C.S. § 6153 ………………………………………………………...…15

# STATEMENT OF JURISDICTION

This case arises from a Notice of Appeal filed on February 28, 2018 from a Judgment in a Criminal Case entered on February 15, 2018. The District Court had subject matter jurisdiction pursuant to 18 U.S.C. §3231.  This court has jurisdiction under 28 U.S.C. § 1291 and under 18 U.S.C. §3742(a)(1) (authorizing the appeal of sentences "imposed in violation of law").

# STATEMENT OF THE ISSUE

1.      Whether the Parole officers who conducted the search of Mr. Henley's home possessed, at the time of the search, a reasonable suspicion belief that evidence of criminal conduct or a parole violation was likely to be found in the home.  The issue was preserved by the filing of a Motion to Suppress, which is referenced on the docket as entry number 54 (App. Vol. II, p. 24).

## STATEMENT OF THE CASE

Appellant, Dwight Henley (hereinafter "Mr. Henley"), was indicted on September 16, 2015 and charged at Count 1 with possession of a firearm by a convicted felon, in violation of 18 U.S.C. §922(g) and §924(e). At Count 2, he was charged with possession with the intent to distribute marijuana, in violation of 21 U.S.C. §841(a)(1) and §841(b)(1)(D). At Count 3, he was charged with possessing a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. §924(c)(1)(A)(i). The conduct at issue was alleged to have occurred on February 23, 2015.

Mr. Henley filed a suppression motion challenging the search of his residence by his state court Parole officer. A suppression hearing was conducted on December 15, 2016. The District Court denied the suppression motion on May 16, 2017. The parties then negotiated a "conditional" plea agreement that permitted Mr. Henley to plead guilty to Counts 1 and 2 and yet appeal the District Court's denial of his suppression motion to this Court. On February 15, 2018, the District Court imposed sentence on Mr. Henley. At Count 1, Mr. Henley was sentenced to a term of imprisonment of 199 months. At Count 2, he was sentenced to a term of imprisonment of 120 months. Count 2 was run concurrent to Count 1. He was also sentenced to a five-year term of supervised release. (App. Vol. I, p. 26-27). This appeal followed.

## STATEMENT OF THE FACTS

The instant prosecution and conviction stems from the search of Mr. Henley's residence by Pennsylvania Board of Probation and Parole officers on February 23, 2015.  During the relevant time period, Joyce Douglass (hereinafter "Agent Douglass" was a Parole Agent for the Commonwealth of Pennsylvania. (App. Vol. II, p. 107). PO Agent Douglass had been a Parole Agent for approximately twenty-five and one-half years. (App. Vol. II, p. 107). Agent Douglass had supervised Mr. Henley since approximately March of 2012.  (App. Vol. I, p. 108).

On February 23, 2015, Parole Agents Douglass, John Sartori and Ronald Fine traveled to Mr. Henley's home to perform a warrantless search for drugs. Specifically, Agent Douglass's testimony was clear concerning the limited purpose of the February 23, 2015 search - it was to find evidence of marijuana dealing, as opposed to evidence of some other, unrelated parole violation:

> Q:  When you got approval from your immediate supervisor for the search that occurred on February 23, when you asked for that approval, what did you tell your supervisor you wanted to search for?
>
> A:  I wanted to search for drugs, and I was concerned that, because he been with somebody with a weapon, that he perhaps might have -- but mostly it was for marijuana.  That's what I was really going to look for.

(App. Vol. II, p. 199).

Upon arrival at Mr. Henley's home, the Parole Agents entered the home, handcuffed Mr. Henley, and immediately began to search for drugs. (App. Vol. II, p. 138).

Based on the results of the initial entry and search, the Police secured a warrant to search Mr. Henley's home.  (App. Vol. II, p. 140).  The resulting search uncovered, *inter alia*, marijuana, a firearm and ammunition, money, and cell phones.

To justify the warrantless search, the Government offered the testimony of Agent Douglass as the sole foundation for its' argument that the Agents had reasonable suspicion.  Her testimony was insufficient and amounted to nothing more than stale speculation premised upon irrelevant innuendo.

For example, early in her testimony, Agent Douglas testified at length about the circumstances surrounding Mr. Henley's separation from his job at MPW in Dravosburg.  (App. Vol. II, p. 115-117).  Mr. Henley worked at MPW for about two years.  (App. Vol. II, p. 180).  Ms. Douglass testified that Mr. Henley was fired from that job in December of 2014 because, according to MPW, Mr. Henley punched a co-worker.  (App. Vol. II, p. 115-117).  Also according to Ms. Douglass, however, when she asked Mr. Henley about why he was fired, he lied, giving a different reason. (App. Vol. II, p. 115-117).  That is, according to Agent Douglass, Mr. Henley explained that he was fired because the other employee inadvertently gave Mr. Henley a pot brownie, which Mr. Henley inadvertently ate, which, in turn, caused Mr. Henley to fail a random drug test administered by MPW.  (App. Vol. II, p. 115-117).  Moreover, Agent Douglass went on to relay a story she heard from some

unknown sources (not associated with MPW) that, following the firing, Mr. Henley's brother Quienty traveled to MPW with a firearm in order to threaten the employee with which Mr. Henley purportedly had a confrontation.[1]  None of this has any logical relevance to the question of whether Mr. Henley was selling marijuana from his home on February 23, 2015 or that any evidence of any violation would be present in his home at the time of the search.

Next, Agent Douglass testified that Mr. Henley was convicted of Driving without a license. (App. Vol. II, p. 117-118).  Once again, this fact has no relevance to the question of whether Mr. Henley was selling marijuana from his home.  And with regard to the timing, this happened in 2012 – over two years before the February 23, 2015 search.  (App. Vol. II, p. 191).

Next, Agent Douglass testified that she suspected that Mr. Henley was in a motorcycle club titled "Maxx'd Out Ryders." (App. Vol. II, p. 120-124).  She further stated that some members of this group have criminal records. (App. Vol. II, p. 120-124).  Other than that, she knew pretty much nothing else about the group, including whether it was founded by a police officer, whether it raises money for charity, or whether it provides food and coats to families in need.  (App. Vol. II, p. 178-179).  More importantly, there was no evidence offered that Maxx'd Out Ryders is an

---

[1] Agent Douglass cited no specific source for this information.  Incidentally, Quienty was present at the suppression hearing, and the parties stipulated that, if he'd testified, he would have vigorously denied these allegations.  (App. Vol. II, p. 208-09).

organization that sells marijuana. Thus, once again, this fact has no relevance to the question of whether Mr. Henley was selling marijuana from his home. Even Agent Douglass herself acknowledged this. (App. Vol. II, p. 177). And again, with regard to the timing, Agent Douglass explained that she learned that Mr. Henley was a member of the Maxx'd Out Ryders at least eighteen months before the February 23, 2015 search. (App. Vol. II, p. 177).

Next, Agent Douglas testified that Mr. Henley, as he was required to do as a condition of his probation/parole, paid $4,600 in court costs and fines in order to get his license back. (App. Vol. II, p. 124-25, 185-86). The final payments in these cases were made in February and April of 2014. (App. Vol. II, p. 185-86). The timing of the payments is significant for two reasons. First, it was two years after he was paroled as well as two years after he began working full-time (in addition to working side jobs). (App. Vol. II, p. 180). Thus, even assuming that he paid the fines and costs with his own money rather than borrowed it from a girlfriend or family member, the amount involved isn't all that significant, particularly given that he had two years to accumulate it. Second, the timing is significant because it occurred nearly one year before the February 23, 2015 search. Thus, even if this fact had some marginal relevance, its probative value would have evaporated by the time of the February 23, 2015 search. In final comment here, Mr. Henley notes that he couldn't win with Agent Douglass supervising him; by complying with the

requirements of his parole and paying his court costs, he was arousing suspicion in Agent Douglass's mind that he must be a drug dealer.

Next, Agent Douglass testified that, on March 20, 2014, during a home visit at Mr. Henley's Pine Alley address, she noticed that Mr. Henley's front door was damaged.  (App. Vol. II, p. 125-27, 190).  According to Agent Douglass, this is compelling evidence that Mr. Henley was dealing drugs because only very rich people and drug dealers are the victims of burglaries and robberies. *See, generally,* (App. Vol. II, p. 125-27).  This misguided assertion is unpersuasive and borderline absurd.  Consequently, it should be afforded no weight.  Moreover, this "fact" was also stale since the search of Mr. Henley's home did not occur for almost a full year later.

To discuss one more example, Agent Douglass asserts generally that Mr. Henley was living a lavish lifestyle that was inconsistent with his meager salary; therefore, he must have been selling drugs.  (App. Vol. II, p. 137).  Yet again, her naked assertions can't survive even cursory scrutiny.  For example, Agent Douglass alleged on direct that Mr. Henley was 'riding high' with three cars, a boat, and a house in Clairton.  (App. Vol. II, p. 65-66, 137).  On cross, however, Agent Douglass acknowledged that she didn't know whether Mr. Henley sold his existing car(s) before buying a new one.  (App. Vol. II, p. 181-83).  Rather, she just knows that, during the time she supervised Mr. Henley, she saw him drive three

separate cars. (App. Vol. II, p. 181-83). Agent Douglass also didn't know how much he paid for any of the cars. (App. Vol. II, p. 181-83). In fact, while for the most part she really couldn't offer any details regarding the cars, she acknowledged that one of them could have been a 2001 Chevy with 115,000 miles (it was). (App. Vol. II, p. 181). Regarding the boat, she couldn't provide any details about the boat because she "do[es]n't know anything about boats" (in reality, it's a cheap, old, tiny fishing boat). (App. Vol. II, p. 188). Finally, it bears mention again that Mr. Henley worked full-time jobs (including overtime) and side jobs during much of the 3 years he was supervised on parole by Agent Douglass, which is plenty of time to save up to buy a cheap used car, a tiny old fishing boat, and even a down payment on a $6,000 house in Clairton.

In reality, Agent Douglass cited to only two factors that are reasonably relevant to the question of whether Mr. Henley was selling marijuana in his home on February 23, 2015. First, according to Agent Douglass, she received recent information that Mr. Henley was selling marijuana. *See, e.g.,* (App. Vol. II, p. 114, 134, 199-200). And she never was more specific than that. She didn't identify the person or persons who supposedly provided her with this information. She didn't identify precisely when or how her nebulous source provided her with this information. She failed to identify how (or if) she was able to independently

corroborate any specific details provided by her source.  Incredibly, we don't even know whether her source was anonymous or not.

Moreover, Agent Douglass testified that this vague and generic information about marijuana dealing, received from unidentified sources, and received shortly before the search, was an important reason underlying her decision to search Mr. Henley's home.  *See, again,* (App. Vol. II, p. 114, 134, 199-200).  However, in the summary report she prepared that documented the reasons for the search, Agent Douglass never cited the information she purportedly received about marijuana dealing.  (App. Vol. II, p. 188).

The other potentially relevant factor cited by Agent Douglass was that, on October 31, 2014 – more than three (3) months before the search – she purportedly smelled "skunk weed," which, according to Agent Douglass, gets its name from the fact that it "smell[s] a lot like skunks."  (App. Vol. II, p. 137-39).  First, this "information" was stale by the date of the search and Agent Douglass failed to offer any persuasive explanation as to why she didn't just initiate a search that day.

Further, it's worthwhile to point out the information that Agent Douglass did not (because she could not) cite.  For example:

- Ms. Douglass never saw Mr. Henley actually possess a controlled substance (App. Vol. II, p. 190-91);

- Neither Ms. Douglass nor any law enforcement officer ever observed Mr. Henley engage in any suspected drug transactions (App. Vol. II, p. 191);

- Ms. Douglass never saw Mr. Henley possess a large amount of cash (App. Vol. II, p. 191); and

- Ms. Douglass never observed Mr. Henley possess any drug selling paraphernalia such as quantities of sandwich baggies to be used for packaging material  (App. Vol. II, p. 192).

These sorts of items are the hallmarks of an actual investigation into narcotics dealing.  Indeed, when we hear a description of an actual drug investigation, we expect to hear about confidential informants entering suspects' homes to buy drugs. We expect to see co-conspirators caught with thousands of dollars in cash and drugs during traffic stops.  We expect to listen to recorded telephone conversations where dealers discuss price, quantity, meeting locations, etc.  At minimum, we expect to hear that an officer saw the defendant in possession of suspected drugs, or that an officer observed the defendant involved in what looked like a suspected drug transaction.  None of that is present here.  In fact, nothing even remotely resembling it is present.

In its totality, the Government's evidence involves incidents that occurred at least several months, if not years, earlier.  Further, most have absolutely no bearing on the question of whether Mr. Henley was selling marijuana.  Finally, and most importantly, absolutely none of the cited factors constitute specific, reliable, objective evidence that marijuana or any other evidence of a parole violation was likely to be present in Mr. Henley's home on February 23, 2015.

## **STATEMENT OF RELATED CASES AND PROCEEDINGS**

There are no related cases or proceedings.

## **STATEMENT OF STANDARD OR SCOPE OF REVIEW**

When reviewing a district court's denial of a suppression motion, this Court reviewed the district court's factual findings for clear error. This Court's review of the district court's application of the law to those facts, however, is plenary. United States v. Perez, 280 318, 336 (3rd Cir. 2002).

# SUMMARY OF ARGUMENT

The Parole Agents did not possess a reasonable suspicion that Mr. Henley had engaged in criminal conduct or that he was in violation of the terms of his probation at the time that they searched his residence.  At best, the Government's evidence involves incidents that occurred at least several months, if not years, earlier. Further, most of the incidents relied upon by the Government as reasons to justify this search have absolutely no bearing on the question of whether Mr. Henley was selling marijuana.  Finally, and most importantly, absolutely none of the cited factors constitute specific, reliable, objective evidence that marijuana or any other evidence of a parole violation was likely to be present in Mr. Henley's home on February 23, 2015.

# ARGUMENT

> On February 23, 2015, parole officers searched Mr.
> Henley's home.  At the time of the search, the facts known
> to the officers did not support a reasonable suspicion belief
> that evidence of criminal activity or a probation violation
> was likely to be found in Mr. Henley's home.  Accordingly,
> all evidence obtained as a result of the search should have
> been suppressed.

Within the context of the Fourth Amendment, a search occurs when a legitimate

expectation of privacy that society considers reasonable is infringed.  Maryland v.

Macon, 472 U.S. 463, 469, 105 S.Ct. 2778, 2782, 86 L.Ed.2d 370 (1985); Katz v.

United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); United States v.

Acosta, 965 F.2d 1248 (3rd Cir. 1992).   Mr. Henley clearly possessed such an

expectation of privacy in his residence.    Where, as in this case, one possesses a

reasonable expectation of privacy, the government must generally procure a warrant

in order to invade this interest. United States v. Harold, 962 F.2d 1131 (3rd Cir. 1992).

Searches conducted without a warrant are *per se* unreasonable, subject to few

established exceptions.  Horton v. California, 496 U.S. 128, 133 n. 4, 110 S.Ct 2301,

2306, 110 L.Ed.2d 112 (1990); United States v. Salmon, 944 F.2d 1106 (3rd Cir. 1991).

One such exception arises in the case of parolees.  A search warrant is not

required to conduct a search provided there exists reasonable suspicion that a parolee

has engaged in criminal activity or has committed a parole violation.  United States

v. Baker, 221 F.3d 438, 443 (3rd Cir. 2000).  The purposes of the probation/parole

system justify this lesser standard.  <u>Griffin v. Wis.</u>, 483 U.S. 868, 873-874 (1987);

<u>Cf</u>. <u>United States v. Hill</u>, 967 F.2d  902, 909 (3rd Cir. 1992) ("A probable cause

requirement  would  divert  the  officer's  attention  from  his  client's   individual

characteristics and needs, and would interfere with appropriate supervision.")

Under Pennsylvania law, people serving a probation or parole sentence retain

their   Constitutional   rights   against   unreasonable   searches   and   seizures.

<u>Commonwealth v. Wilson</u>, 67 A.3d 736, 744-45 (Pa. 2013).   Indeed, as the

Pennsylvania Supreme Court explicitly recognized in *Wilson*, though a parolee's

privacy rights are  diminished, they  nevertheless  remain intact.   *Id.*   As such,

warrantless, suspicion-less parole searches are unlawful.  *Id.*

Consistent with these general principles, in order for a warrantless parole

search conducted by a Pennsylvania Parole agent to be lawful, it must be conducted

consistent with the requirements of 61 Pa.C.S. § 6153.  Section 6153 provides:

> **(b) Searches and seizures authorized.**--
> (1)  Agents  may search the  person  and  property  of offenders in
> accordance with the provisions of this section.
> (2) Nothing in this  section  shall be construed to  permit searches or
> seizures in violation of the Constitution of the United States or section
> 8 of Article I of the Constitution of Pennsylvania.
> **(c) Effect of violation.**--No violation of this section shall constitute an
> independent  ground  for  suppression  of  evidence  in  any  probation
> or parole proceeding or criminal proceeding.
> **(d) Grounds for personal search of offender.**—
>              ***
> (2) A property search may  be  conducted  by  an  agent  if  there  is
> reasonable suspicion to believe that the real or other property in the

possession of or under the control of the offender contains contraband or other evidence of violations of the conditions of supervision.

(3) Prior approval of a supervisor shall be obtained for a property search absent exigent circumstances. No prior approval shall be required for a personal search.

(4) A written report of every property search conducted without prior approval shall be prepared by the agent who conducted the search and filed in the offender's case record. The exigent circumstances shall be stated in the report.

\*\*\*

(6) The existence of reasonable suspicion to search shall be determined in accordance with constitutional search and seizure provisions as applied by judicial decision. In accordance with such case law, the following factors, where applicable, may be taken into account:

(i) The observations of agents.

(ii) Information provided by others.

(iii) The activities of the offender.

(iv) Information provided by the offender.

(v) The experience of agents with the offender.

(vi) The experience of agents in similar circumstances.

(vii) The prior criminal and supervisory history of the offender.

(viii) The need to verify compliance with the conditions of supervision.

Distilled to its essence, Section 6153 stands for the following proposition: before a Pennsylvania parole agent can search a parolee's home for evidence of a parole violation (such as drug dealing), she must possess reasonable suspicion to believe that the home in fact contains such evidence at the time the search was conducted. *See id.*; *accord*, United States v. Baker, 221 F.3d 438, 449 (3d Cir. 2000) (presciently predicting that, when directly confronted with the question, the Pennsylvania Supreme Court would hold that warrantless parole searches must be supported by reasonable suspicion).

16

Reasonable suspicion must be based on "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion". <u>Terry v. Ohio</u>, 392 U.S. 1, 30, 20 L.Ed.2d 889, 88 S.Ct. 1868 (1968); see also <u>United States v. Nazarok</u>, 737 F.2d 360, 365 (3rd Cir. 1984).    "Reasonable suspicion" is a common sense, non-technical concept that deals with "the factual and practical  considerations of everyday life on which reasonable and prudent men, not legal technicians, act." <u>Ornelas v. United States</u>, 517 U.S. 690, 695 (1996) (quoting <u>Illinois v. Gates</u>, 462 U.S. 213(1983)).  The standard is "not readily or even usefully reduced to a neat set of legal rules." <u>Id</u>.  A court must look at the "totality of the circumstances' of each case to see whether the officer has a 'particularized and objective basis' for suspecting legal wrongdoing." <u>United States v. Arvizu</u>, 534 U.S. 266, 273, 122 S. Ct. 744, 151 L. Ed. 2d 740 (2002) (quoting <u>United States v. Cortez</u>, 449 U.S. 411, 417-18, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981)). The law allows "officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" <u>Id</u>. (citing <u>Cortez</u>, 449 U.S. at 418).

As a general matter, reasonable suspicion is present whenever an officer has "a particularized and objective basis" for suspecting that an individual has been or is about to engage in criminal activity. <u>Id</u>. (quoting <u>Cortez</u>, 449 U.S. at 417-18 (1981)). Accordingly, in this case, the burden is on the Government to demonstrate that the

totality of circumstance demonstrates that reasonable suspicion existed to establish that Mr. Henley had engaged in criminal conduct or committed a parole violation prior to searching his residence. See <u>United States v. Johnson</u>, 63 F.3d 242, 245 (3rd Cir. 1995). If the Government does not establish reasonable suspicion for the search, any evidence obtained by law enforcement as a result of the unlawful search, and all evidence derived therefrom, must be suppressed. <u>United States v. Brown</u>, 448 F.3d 239, 244 (3d Cir. 2006); see also <u>Wong Sun v. United States,</u> 371 U.S. 471, 487-88, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963*)* (citation omitted).

To be relevant, information relied upon to justify a search of a parolee's home must, of course, be timely. Indeed, the Third Circuit has discussed the requirement of 'fresh' information in the analogous context of a probable cause determination:

> Age of the information supporting a warrant application is a factor in determining probable cause. If too old, the information is stale, and probable cause [to believe that contraband will still be found in its suspected location] may no longer exist. Age alone, however, does not determine staleness. "The determination of probable cause is not merely an exercise in counting the days or even months between the facts relied on and the issuance of the warrant." Rather, we must also examine the nature of the crime and the type of evidence.

<u>United States v. *Harvey*</u>, 2 F.3d 1318, 1322 (3d Cir.1993); *cf. also <u>Sgro v. United States</u>*, 287 U.S. 206, 210 (1932) (explaining that, when evaluating whether a warrant application sets forth sufficient facts to establish probable cause, courts must be mindful of the fact that "it is manifest that the proof must be of facts so closely

related to the time of the issue of the warrant as to justify a finding of probable cause at that time.").

As the Third Circuit emphasized in <u>Harvey</u>, when evaluating staleness, the nature of the crime is important.  For example, in <u>Harvey</u>, the Court focused on the fact that the crime at issue was possession of child pornography.  *Id.* at 1322-23.  At the suppression hearing, the Government called a special agent who testified that persons who possess child pornography are likely to hold on to their sexually explicit materials for extended lengths of time.  *Id.*  Thus, the fact that the suspicious packages identified in the warrant application were bought two months or more before the search was insignificant, precisely because the materials were likely to have been retained by the suspect, and, thus, remained present in his home.  *Id.*

In contrast, when the nature of the crime is possession of drugs, the evidence is more likely to disappear quickly.  *See, e.g.,* <u>Commonwealth v. Janda</u>, 14 A.3d 147, 158-59 (Pa. Super. 2011).  Indeed, "a stale observation of items that can be quickly disposed of, such as drugs, does not provide probable cause for a warrant absent evidence of an ongoing course of conduct on the part of the defendant." *See id.*  In recognition of this, the Pennsylvania Superior Court has found probable cause lacking to search a suspect's home where the evidence cited in support of the search was seven weeks old.   <u>Commonwealth v. Novak</u>, 335 A.2d 773, 775–76 (1975).

Now, it's true that staleness is not a problem when the Government offers evidence of an actual investigation that has continuously tracked protracted and ongoing drug activity in the area searched. This is so because, when there is reliable evidence that the criminal activity is continuous and ongoing, it is likely that contraband will still be found in the area searched even after some time lapses between the observation of the 'stale' information and the search. *See, e.g.*, United States v. Williams, 124 F.3d 411, 420 (3d Cir. 1997) (explaining that when "an activity [such as illegal gambling or narcotics trafficking] is of a protracted and continuous nature, 'the passage of time becomes less significant.' Thus, when the criminal activity has been going on continuously for years, staleness is of less concern.") and United States v. Harris, 482 F.2d 1115, 1119-1120 (3d Cir.1973) (staleness did not negate probable cause finding because the Government offered evidence of a multi-faceted investigation – involving multiple law enforcement agencies as well as informants, government surveillance, etc. – which showed that drug conspiracy was both ongoing and had been going on continuously for an extended period of time). However, in the absence of such evidence, stale information regarding drug activity cannot be relied upon to justify a search. See Janda, *supra* (where no evidence was offered of an investigation that documented continuous narcotics activity, seven-week old observation of drugs in defendant's home could not justify search).

As noted above, the purpose of the February 23, 2015 search was to find evidence of marijuana dealing. Therefore, in order to show that the search was lawful, the Government was required to establish that Agent Douglass possessed a reasonable suspicion – based on specific, particularized, and non-stale facts – that, on February 23, 2015, evidence of marijuana dealing would be found in Mr. Henley's home. The Government failed to meet this burden. Further, the Government failed to establish that Agent Douglass possessed reasonable suspicion-based on specific, particularized, and non-stale facts – that, on February 23, 2015, evidence of any crime or parole violation would be found in Mr. Henley's residence. The evidence should have been suppressed.

"Reasonable suspicion requires 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion' of a warrantless search." Baker, 221 F.3d at 444. An officer's "inchoate and unparticularized suspicion or hunch" will not suffice to establish reasonable suspicion. Terry, 392 U.S. at 27. Further, in the specific context of a warrantless parole search, a court must evaluate whether the parole officer had a " 'particularized and objective basis' for suspecting legal wrongdoing …." United States v. Perminter, 2012 WL 273349 (W.D. Pa. 2012)

Here, Agent Douglass offered a laundry list of complaints about Mr. Henley. However, the vast majority of those complaints are irrelevant to the question of

whether he was likely to have marijuana in his home on February 23, 2015. Therefore, most of the laundry list should not have been considered in the reasonable suspicion analysis.  *Cf.* Baker, 221 F.3d at 445 (en route to suppressing drug evidence recovered in a warrantless parole search, the Court reasoned that evidence of unrelated parole violations was irrelevant to the specific question of whether parole officers had reasonable suspicion to believe that parolee had contraband in his trunk).

In truth, only two factors cited by Agent Douglass are relevant to the question of whether Mr. Henley's home was likely to contain marijuana on February 23, 2015.  First, there's Agent Douglass's assertion that she smelled "skunk weed" in Mr. Henley's home on October 31, 2014.  Well, at the outset, this claim should not be afforded much, if any, weight, because the Government failed to show how Agent Douglass's training and experience make her qualified to detect the smell of skunk weed (let alone how that training would enable her to estimate the specific quantity of marijuana at between one half to one full pound).  *Cf.* Commonwealth v. Randolph, 151 A.3d 170, (Pa. Super. 2016) (explaining that an officer's conclusory assertion that his suspicions were based on a generic claim of knowledge and experience isn't entitled to much weight; rather, an officer must specifically identify his relevant training and experience, as well as explain how it specifically applies to

the circumstances at hand).[2]  Moreover, no convincing explanation was offered as to why Agent Douglass failed to immediately search Mr. Henley's house when she supposedly smelled the skunk weed.

Moreover, this information was unquestionably stale, and, for this reason alone, should be discounted.  The smell date was October 31, 2014.  The search itself, however, wasn't conducted until February 23, 2015 – nearly four months later. Importantly, drugs, perhaps more than any other type of contraband, are of an evanescent nature.  Thus, in the absence of evidence of an investigation documenting continuous and ongoing drug activity in the area searched (of which there is none in this case), it would be unreasonable to simply assume that drugs would still be present in Mr. Henley's home four months after the sniff.  *See* Novak*, supra* (holding that seven-week old visual observation of drugs in defendant's home was stale, and, thus, did not support a probable cause belief that drugs were still present).

---

[2] En route to granting suppression of the evidence, the *Randolph* Court further explained:
> Corporal Hanlon failed to explain how his "training and experience" led him to recognize that the compartment [that was the subject of the search] was "commonly used to transport guns, drugs and U.S. currency." He neglected to list what classes he has attended or certifications he has received on this subject, the number or type of cases he has participated in where officers discovered hidden compartments containing drugs or weapons, or even how long he has been a law enforcement officer. Thus, his claim of "knowledge and experience" was an empty phrase that failed to tilt the scales toward probable cause.

Commonwealth v. Randolph, 151 A.3d 170, (Pa. Super. 2016)

In fact, it is the lack of evidence of an actual investigation documenting continuous and ongoing criminal activity that makes staleness a critical factor here. Indeed, because there was no evidence offered of continuous and ongoing drug activity in Mr. Henley's home, this case is factually distinguishable from Third Circuit decisions such as <u>Yokshan</u> and <u>Strickland</u>, where staleness wasn't a problem because, in contrast to this case, there was evidence of continuous and ongoing criminal activity in the area searched. *Cf.* <u>United States v. Yokshan</u>, 431 Fed.Appx. 170 (3d Cir. 2011) (staleness not a problem because Government offered evidence of a multi-faceted investigation that showed continuous and ongoing drug activity, which, in turn, made it likely that, though some time had elapsed between the observation of the 'stale' fact(s) and the search, contraband would still be found at the time of the search) and <u>United States v. Strickland,</u> 237 Fed.Appx. 773 (3rd Cir. 2007) (staleness again not a problem because (a) the Government proffered reliable evidence, from a known and identified source, of continuous and ongoing criminal activity in defendant's home, (b) the type of contraband at issue, firearms, was not perishable, and (c) defendant was incarcerated from the time of the agents' initial visual observations of illegal activity to the time of the search, and, thus, had no opportunity to remove the contraband from his home). In sum, the stale smell evidence should not be afforded any weight in the reasonable suspicion analysis.

And that leaves with us the second relevant "fact" cited by Agent Douglass in support of her belief that Mr. Henley had marijuana in his home on February 23, 2015 - her nebulous information that Mr. Henley was selling marijuana. Again, she cites no source for this information. Were these anonymous tips? Confidential informers? None of the above? Further, few specifics are offered regarding the details of the supposed marijuana-selling operation. Moreover, Agent Douglass never testified that she was able to independently corroborate any of the "information" she received. As far as reliability, Agent Douglass's vague, uncorroborated information from unknown sources probably doesn't even rise to the level of an uncorroborated anonymous tip. *Cf.* Perminter, *at* 8-14 (suppressing drug evidence because uncorroborated tip from anonymous source concerning drug activity in defendant's home did not provide parole agents with reasonable suspicion to search parolee's home).

Although not precedential, Judge Barry Fischer's district court decision in Perminter is on point, and thus warrants further discussion. In Perminter, Pennsylvania parole agents received a phone call from a person who indicated that they did not want to be identified. This anonymous source gave the agents a detailed account of ongoing drug activity occurring out of Defendant's home. The agents did not independently corroborate the information. Armed with this uncorroborated information from an unidentified source (as well as knowledge that Defendant had

several prior drug convictions) the agents searched Defendant's home and found a substantial amount of drugs and a gun.  Defendant moved to suppress the evidence found in his home on the basis that the agents did not possess reasonable suspicion, based on reliable, specific, and objective facts, that evidence of criminal activity was likely to be found in Defendant's home.  On these facts, the trial court granted suppression.  See id.

This case is substantially similar to Perminter, and its outcome should be the same.  As in Perminter, the agents here acted on information from unidentified sources.  Also as in Perminter, the agents here failed to offer evidence that they independently corroborated the information that they received from their source.  In fact, if anything, the information relied upon by the agents in Perminter was more reliable than that present here because it was at least specific.  Cf. Perminter, at 3. (caller indicated that there was a black automatic handgun in the home; that marijuana and a scale were in the kitchen; and that crack cocaine was in a bedroom dresser).

Under these facts, Agent Douglass simply did not possess a "particularized and objective basis for suspecting legal wrongdoing" in Mr. Henley's home on the relevant date.

## CONCLUSION

For the foregoing reasons, it is respectfully requested that this Court vacate the judgment of sentence in this case and reverse the order denying suppression in this case.  Because suppression of the evidence seized during the search will render the government incapable of moving forward with the instant prosecution, it is respectfully requested that Mr. Henley be discharged.

Respectfully submitted,

/s Giuseppe GC Rosselli

Giuseppe GC Rosselli
PA ID No. 87248

Law Office of Giuseppe GC Rosselli
660 Lincoln Avenue
Suite 107
Pittsburgh, Pa 15202
(412) 281-8008
(412) 774-8008 (fax)

August 10, 2018                          Counsel for Dwight D. Henley

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Case No. 18-1428

_____

UNITED STATES OF AMERICA,

Appellee,

v.

DWIGHT HENLEY

Appellant.

_____

APPENDIX, VOLUME I

_____

Appeal from the Judgment in a Criminal Case from the United States District Court
for the Western District of Pennsylvania, at Criminal No. 15-199, The Honorable
Mark R. Hornak, Entered on February 15, 2018

_____

Giuseppe GC Rosselli
Counsel for Appellant,
Dwight Henley

660 Lincoln Avenue
Suite 107
Pittsburgh, PA 15202
(412) 281-8008

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

### FILE NO.  0315 2:15CR00199-001

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | |
| **VS.** | ) | **NOTICE OF APPEAL** |
| | ) | |
| | ) | |
| **DWIGHT D. HENLEY** | ) | |
| **DEFENDANT** | ) | |

Notice is hereby given that Defendant, Dwight D. Henley, in the above-named case, hereby appeals to the United States Court of Appeals for the 3rd Circuit from the final judgment entered in this action on the 15th day of February, 2018.  Specifically, notice is hereby given that Dwight Henley intends to appeal the District Court's Order dated May 16, 2017, denying Mr. Henley's Motion to Suppress Evidence.

/s/ Giuseppe GC Rosselli

Attorney for Defendant Dwight D. Henley

Law Office of Giuseppe GC Rosselli
660 Lincoln Avenue
Suite 107
Pittsburgh, Pa 15202
(412) 281-8008

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|                                |     |                        |
|--------------------------------|-----|------------------------|
| UNITED STATES OF AMERICA,      | )   |                        |
|                                | )   |                        |
|                                | )   | 2:15-cr-199            |
| v.                             | )   |                        |
|                                | )   | Judge Mark R. Hornak   |
| DWIGHT D. HENLEY,              | )   |                        |
|           Defendant.           | )   |                        |
|                                | )   |                        |

### ORDER

AND NOW, this 16th day of May, 2017, it is hereby ORDERED that for the reasons set forth in the Court's Opinion of this date, the Defendant's Motion to Suppress Evidence [ECF No. 54] is DENIED. Furthermore, it is ORDERED that the Defendant's Motion for Discovery [ECF No. 55] is granted in part and denied in part. Paragraphs 3 (a), (b), (c), (d), (e), (f), (g), (i), (j), (k), (l), (m), (n), (o), (p), (q), (s), (t), and (u) of the Motion for Discovery are DENIED without prejudice. Paragraph 3 (r) is GRANTED, as set forth in the Court's Opinion. Paragraph 3 (h) is DISMISSED without prejudice as moot. A timeline for further evidentiary disclosures shall be set by the Court in the Pretrial Order, which will be issued separately. A trial scheduling conference is set for May 22, 2017 at 3:00 p.m.

Mark R. Hornak
United States District Judge

cc:    All counsel of record

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|                            |   |                      |
|----------------------------|---|----------------------|
| UNITED STATES OF AMERICA,  | ) |                      |
|                            | ) | 2:15-cr-199          |
| v.                         | ) |                      |
|                            | ) | Judge Mark R. Hornak |
| DWIGHT D. HENLEY,          | ) |                      |
| Defendant.                 | ) |                      |

## OPINION

**Mark R. Hornak, United States District Judge**

Pending before this Court are the Defendant's Motion to Suppress Evidence, ECF No. 54, and the Defendant's Motion for Discovery, ECF No. 55. For the reasons that follow, the Defendant's Motion to Suppress Evidence is denied, and the Defendant's Motion for Discovery is granted in part and denied in part.

I.     **BACKGROUND**

On September 16, 2015, the Defendant was charged with possession of a firearm and ammunition by a convicted felon, possession with intent to distribute marijuana and possession of a firearm in furtherance of a drug trafficking crime. ECF No. 1. The events at issue here and leading up to the Defendant's indictment are as follows.

On March 6, 2012, the Defendant was placed on Pennsylvania state parole (based on offenses separate from those at issue in this case), and Pennsylvania Board of Probation and Parole Agent Joyce Douglass became his supervisor. ECF No. 54-1 at 2-3. Agent Douglass had been a parole agent for over twenty (20) years. ECF No. 67 at 40:13-40:17. According to Agent Douglass' testimony at the suppression hearing held on December 15, 2016, at the beginning of his parole period, the Defendant was "working" and "doing really well." ECF 67 at 42:2-42:3. He did have one brush with the law—a citation for driving without a license—but it did not

cause Agent Douglass any "undue concern." *Id.* at 50:11-51:14. However, as more time passed, Agent Douglass began to "[see] things that just made [her] concerned." *Id.* at 44:9-44:10.

First, the Defendant "started to hang around with people that [Agent Douglass] had good indications of that were still doing illegal activities, particularly drug sales." *Id.* at 44:12-44:14. Such people included Jarron Bell, who was another of Agent Douglass' supervisees, *id.* at 50:9-50:10, 61:20-61:21, and the Defendant's brother, Quienty Henley. *Id.* at 51:24-52:7. The Defendant's parole conditions prohibited him from associating with convicted felons, but Agent Douglass testified that enforcing the condition was in her discretion. *Id.* at 137:3-137:24.

Second, Defendant moved out of his sister's house and into a house that he told Agent Douglass he had purchased from Quienty Henley for one ($1) dollar. *Id.* at 44:14-44:15; 51:19-51:23. The Defendant was supposed to report any plans to move to Agent Douglass before actually moving, but he called Agent Douglass to inform her of his move after it had happened. *Id.* at 51:19-51:23. The Defendant also did not inform Agent Douglass when he later moved out of the house he had purchased from his brother. *Id.* at 65:2-65:15.

Third, Agent Douglass discovered attire bearing the insignia of the Maxx'd Out Ryders motorcycle club in the Defendant's home. *Id.* at 53:17-53:19. She also saw a photograph of the Defendant with the group. *Id.* at 53:23-53:24. Agent Douglass testified "there were several people in the club that [she] knew that [she] had previously had on parole," *id.* at 53:12-53:13, but that "other than that, [she] really didn't have a whole lot of information about it." *Id.* at 53:13-53:14.

Fourth, Agent Douglass noticed that the Defendant was working less. When she spoke to the Defendant's employer, she learned that the Defendant was choosing not to work as much even though work was available for him. *Id.* at 54:5-54:10.

2

Fifth, the Defendant violated his parole by traveling outside of the area in which he was permitted to travel without prior permission. *Id.* at 54:24-55:17. The Defendant told Agent Douglass that he had gone fishing, but Agent Douglass testified that she received information that the Defendant was actually attending the Maxx'd Out Ryders' "bike week" trip. *Id.* at 55:15-56:16. The Defendant's parole-violating travel occurred at some point in the first half of 2013, and the Defendant was placed on electronic monitoring from June 12, 2013 until July 10, 2013. *Id.* at 110:23-111:5.

Sixth, Agent Douglass believed that the Defendant was spending more money than he was making at his job, especially given that, as noted, he had begun working less. Agent Douglass noted that the Defendant had hired a lawyer and quickly paid off approximately $4,600 in fines. *Id.* at 57:21-58:17. Additionally, Agent Douglass testified that the Defendant moved out of the house he had purchased from his brother and into a new house, which had been remodeled and contained new furniture.[1] *Id.* at 65:10-66:4. She also testified that the Defendant had a motorcycle, a truck, two cars, and a boat in his name. *Id.* at 70:2-70:4. However, Agent Douglass admitted that she was not sure how much the Defendant had paid for any of the vehicles or whether or not he had sold any of them while on parole. *Id.* at 115:20-117:19.

Seventh, in March of 2014, Agent Douglass arrived at the Defendant's house and found that his door had been kicked in. *Id.* at 58:18-58:22. The Defendant told her that someone had broken into his house. *Id.* at 58:23-58:24. Agent Douglass testified that the event made her suspicious because "in [her] experience and everything that [she's] ever dealt with, [a break in

---

[1] Agent Douglass testified that Jarron Bell purchased the Defendant's house, although Jarron Bell initially lied to Agent Douglass about whether or not the Defendant still lived there. According to Agent Douglass, the Defendant came clean to her and clarified that he had sold his property to Jarron Bell for $800, even though she ascertained that it had been sold for one ($1) dollar on paper. ECF No. 67 at 61:18-66:18.

3

would occur] because of drugs, you know, people coming in and looking for drugs or money or guns." *Id.* at 60:13-60:16.

Eighth, at some point during the Defendant's parole, he visited Agent Douglass' office and had what she described as a "fair amount of cash on him." *Id.* at 125:14-125:15. However, Agent Douglass clarified that it was not a "real large amount[] of cash," *id.* at 127:17, and that she did not think the event was worth documenting in any of her reports on the Defendant. *Id.* at 125:23-125:25.

Ninth, on October 31, 2014, Agent Douglass visited the Defendant's home and smelled what she described as "skunk weed." *Id.* at 70:10-70:21. Although the Defendant told Agent Douglass that he had a skunk infestation, *id.* at 70:24-70:25, Agent Douglass testified that she was certain the smell was marijuana, *id.* at 71:2-71:4, and that the smell was so strong that she assumed it was anywhere from a half pound to a pound of marijuana. *Id.* at 72:6-72:9.

Tenth, the Defendant was fired from his job in December of 2014. *Id.* at 105:2-106:1. The Defendant told Agent Douglass that he was fired because he had failed a drug test for marijuana after inadvertently eating a marijuana-laced brownie made by his coworker. *Id.* at 48:14-48:17. However, Agent Douglass spoke with the Defendant's employer, who told her that the Defendant was terminated because he had punched another employee.[2] *Id.* at 49:3-49:4. Agent Douglass also received information from unidentified sources that Quienty Henley had

---

[2] At the suppression hearing, the Defendant's counsel seemed to aver through his questions on cross-examination of Agent Douglass that the Defendant had told Agent Douglass that both accounts were true—he had fought with another employee because the employee had given him a brownie laced with marijuana. Agent Douglass had no memory of being told such story. *Id.* at 105:6-105:19.

4

come to the Defendant's workplace during the Defendant's alleged altercation and had had a handgun with him. *Id.* at 49:5-49:11, 133:2-133:9.[3]

Finally, Agent Douglass testified that she had received ongoing information, up until February 23, 2015, that the Defendant was selling marijuana and that he was paying his subordinates in heroin. *Id.* at 47:10-47:13, 66:24-67:4, 133:18-134:17. Agent Douglass did not specify who provided her with this information or how many sources she had.

Because of the events and circumstances detailed above, Agent Douglass asked her supervisor for permission to search the Defendant's home, and she was granted it on February 22, 2015. *Id.* at 47:22-48:2. On February 23, 2015, Agent Douglass, along with Parole Agents Fine and Sartori, *id.* at 40:23, went to the Defendant's house intending to search for evidence of marijuana dealing. *Id.* at 133:14-133:23. They did not have a warrant. According to Agent Douglass' testimony, the Defendant's door was open when the agents arrived, and they walked into the residence. *Id.* at 69:1-69:15. The agents then informed the Defendant that they were going to handcuff him while they searched the house, and they did handcuff him. *Id.* at 71:9-71:19. Agent Sartori next informed the Defendant that he was going to search him and asked the Defendant if he had anything on his person that could "hurt," "cut" or "stick" Agent Sartori. *Id.* at 12:18-12:23. According to Agent Sartori, the Defendant did not answer that question, but responded by telling Agent Sartori that "he had been smoking a joint, and the joint was in the kitchen cabinet."[4] *Id.* at 13:10-13:11. Agent Sartori left the Defendant with Agent Fine, *id.* at 66:22, and proceeded into the kitchen and looked in the cabinet, where he found a cup that

---

[3] The parties stipulated during the suppression hearing that were Quienty Henley to have testified at the Hearing, he would have vigorously denied that such events occurred. *Id.* at 141:4-143:3. The Court gives the assertion about Quienty Henley's actions no weight in its analysis here.

[4] Although the Defendant suggests in his papers that Agent Sartori's account of his statement might be wrong, Agent Sartori's account is uncontradicted in the record before the Court. Accordingly, the Court will accept it as true for the purposes of this Opinion.

contained a bag with marijuana and a digital scale. *Id.* at 15:1-15:4. At that point, the agents stopped their search and informed the Defendant that they were going to obtain a search warrant. *Id.* 16:12-16:17. They also informed him that he should not speak to them until the local police arrived, and they repeated this instruction several times. *Id.* at 16:12-17:2. However, the Defendant did not heed such direction and told the agents that he had a firearm upstairs.[5] *Id.* at 17:5-17:8. The Defendant was taken to the local police station, *id.* at 91:22-91:24, and a warrant to search the house was issued. ECF No. 54-5. Law enforcement conducted a search of the Defendant's home and recovered $2,170.00 in U.S. currency, 275.1 grams of marijuana in one large plastic bag containing 9 smaller bags individually packaged, 529.3 grams of marijuana in a vacuum-sealed package, two scales, a marijuana grinder, a Taurus .45 caliber pistol, ammunition, three cellular phones and various other electronic devices. ECF No. 54-7. On February 24, 2015, the police applied for a warrant to search the cellular phones found in the Defendant's home. *Id.*, ECF No. 54-8. The request was granted, *id.*, but to date there is nothing in the record clarifying whether the phones have been searched. *See* ECF No. 54-1 at 10.

II.    **DISCUSSION**

In this case, the Defendant is seeking to suppress all the physical evidence found during the searches of his house and the statements he made to the parole agents in his home. ECF No. 54 at 1-3. It is well-established that "evidence seized during an unlawful search [can]not constitute proof against the victim of the search," and that "[t]he exclusionary prohibition extends as well to the indirect as the direct products of such invasions." *Wong Sun v. United States*, 371 U.S. 471, 484, 83 S. Ct. 407, 416, 9 L. Ed. 2d 441 (1963) (citing *Weeks v. United States*, 232 U.S. 383, 34 S. Ct. 341, 58 L. Ed. 652 (1914), *overruled on other grounds by Mapp*

---

[5] As above, there is no evidence in the record to suggest that the Defendant did not make his statement in the manner that Agent Sartori discussed, so the Court will accept the facts as they were set forth in Agent Sartori's testimony.

*v. Ohio*, 367 U.S. 643, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961)). Furthermore, "the prosecution may not use statements" made in violation of *Miranda*. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). To appropriately evaluate the Defendant's Suppression motion and determine if any such evidence should be excluded, the Court will analyze the parole agents and police officers' actions in chronological order.

### A.   The Parole Agents' Search of the Defendant's House

The first event the Court must consider is the warrantless search of the Defendant's home by Agents Douglass, Fine and Sartori. In general, "[i]t remains a cardinal principle that searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment-subject only to a few specifically established and well-delineated exceptions." *California v. Acevedo*, 500 U.S. 565, 580 (1991) (internal quotations omitted). In this case, the Government argues that the agents' warrantless search was not *per se* unreasonable because parole searches fall into the "special needs" exception to the warrant requirement. ECF No. 59 at 15. The Government is correct, see *United States v. Hill*, 967 F.2d 902 (3d Cir. 1992), and the Third Circuit has "determined that Pennsylvania may empower a parole officer to conduct a warrantless search of a parolee's property based on reasonable suspicion that the parolee has violated a condition of parole." *United States v. Strickland*, 237 F. App'x 773, 777 (3d Cir. 2007) (citations omitted).

This determination is outlined in Section 6153 of Title 61 of of the Pennsylvania Consolidated Statutes, which explains that "[a] property search may be conducted by an agent if there is reasonable suspicion to believe that the real or other property in the possession of or under the control of the offender contains contraband or other evidence of violations of the

conditions of supervision." 61 Pa.C.S. § 6153(d)(2).[6] In this case, the burden to prove reasonable

suspicion is on the Government because there was no warrant for the search of the Defendant's

home. *See United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995) ("As a general rule, the

burden of proof is on the defendant who seeks to suppress evidence. However, once the

defendant has established a basis for his motion, *i.e.,* the search or seizure was conducted without

a warrant, the burden shifts to the government to show that the search or seizure was

reasonable.") (internal citations omitted).

Accounting for the standard set out in § 6153 and for the testimony presented at the

suppression hearing, the question for the Court thus becomes whether Agent Douglass had

reasonable suspicion to believe that the Defendant's house contained evidence of marijuana

dealing on February 23, 2015.[7] In short, the answer is yes.

The Supreme Court has explained that:

> Reasonable suspicion is a less demanding standard than probable cause not only
> in the sense that reasonable suspicion can be established with information that is
> different in quantity or content than that required to establish probable cause, but
> also in the sense that reasonable suspicion can arise from information that is less
> reliable than that required to show probable cause.

*Alabama v. White*, 496 U.S. 325, 330, 110 S. Ct. 2412, 2416, 110 L. Ed. 2d 301 (1990).

Additionally, "In deciding whether reasonable suspicion exists, [the Court must] consider the

totality of the circumstances to determine whether the officer has a particularized and objective

basis for suspecting legal wrongdoing. Furthermore, a parole officer's decision to search a

---

[6] Absent exigent circumstances, an agent must receive approval from her supervisor before searching a parolee's property. 61 Pa.C.S. § 6153(d)(3). In this case, Agent Douglass testified that she received the proper approval before going to the Defendant's home on February 23, 2015. ECF No. 67 at 47:22-48:2. There is no evidence to the contrary.

[7] Agent Douglass testified that she specifically wanted to search for evidence of marijuana dealing, *id.* at 133:14-133:23. Additionally, the Court notes that it need not evaluate whether Agent Douglass had the requisite reasonable suspicion to search the Defendant's property for marijuana use because she testified that she had no indication that the Defendant was using marijuana. *Id.* at 67:14-67:16.

8

parolee's home must be based on specific facts." *United States v. Strickland*, 237 F. App'x 773, 777–78 (3d Cir. 2007) (internal citations and quotations omitted). "A mere hunch does not create reasonable suspicion." *Navarette v. California*, 134 S. Ct. 1683, 1687 (2014) (internal quotations omitted). In considering whether the reasonable suspicion standard is met, the Court must examine only the facts known to the parole officer at the time of the search. *See United States v. Brown*, 448 F.3d 239, 245 (3d Cir. 2006).

In this case, Agent Douglass has provided numerous interlocking bases for her suspicion about the Defendant, and the reasonable suspicion standard has been met. First, the Court will examine what seems to be the Government's most direct evidence—the fact that Agent Douglass testified that she had received ongoing information that the Defendant was dealing marijuana. The Court's primary task is to determine to what extent it should give weight to the information reportedly received by Agent Douglass. In some instances, a tip received from a confidential informant can be enough to fully establish reasonable suspicion. As the Third Circuit has explained in another context requiring reasonable suspicion, *Terry* stops, the Court "must scrutinize the informant's 'veracity, reliability, and basis of knowledge' to determine whether the information relied upon by the police was sufficient to establish reasonable suspicion." *United States v. Serrano*, 598 F. App'x 72, 75 (3d Cir.), *cert. denied*, 135 S. Ct. 2363, 192 L. Ed. 2d 155 (2015). To evaluate the reliability of a tip, the Court must consider whether:

> (1) the information was provided to the police in a face-to-face interaction, allowing an officer to assess directly the informant's credibility; (2) the informant can be held responsible if her allegations are untrue; (3) the information would not be available to the ordinary observer; (4) the informant has recently witnessed the criminal activity at issue; and (5) the witness's information accurately predicts future activity.

*Id.*

In this case, the Court cannot fully evaluate such factors because there is no information in the record pertaining to any of them. In fact, Agent Douglass did not reveal how many sources she had, whether or not her source or sources were anonymous and if not, who they were, how she received the information (in person, over the phone, etc.) or what specifically she was told, aside from that the Defendant was dealing marijuana and was paying his subordinates in heroin. Furthermore, the Court cannot find any useful information in the Defendant's Supervision History or in the field report Agent Douglass completed on the day of the search because Agent Douglass failed to include any mention of the information she received in such reports. *See* ECF No. 54-2; Def. Exhibit B. Accordingly, the Court cannot conclude that the information Agent Douglass received was sufficient on its own to establish reasonable suspicion that the Defendant was dealing marijuana. Thus, in order for the Government to meet its burden as to this point, the Court must conclude that the information Agent Douglass received was sufficiently bolstered by the other circumstances she testified about such that reasonable suspicion existed for the search. *See United States v. Silveus*, 542 F.3d 993, 1000 (3d Cir. 2008) ("As the Supreme Court stated in *White,* 'if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable.' By 'information,' *White* implies corroborative information known to or discovered by the police, which can, when coupled with the tip, create reasonable suspicion to make a stop.") (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)) (internal citations omitted); *United States v. Torres*, 534 F.3d 207, 211 (3d Cir. 2008) ("Other factors can bolster what would otherwise be an insufficient tip").

Considering all of the circumstances present here when Agent Douglass sought and received permission to search, the Court concludes that the reasonable suspicion standard has

been met in this case. At the time of the search on February 23, 2015, Agent Douglass had not only received information that the Defendant was selling marijuana, but she was also aware of other circumstances that made her reasonably and legitimately suspicious that such information was correct. *Cf. United States v. Perminter*, 2012 WL 273349, at *4 (W.D. Pa. Jan. 30, 2012) (anonymous tip was the only information available to support suspicion).

First, Agent Douglass believed that there was a large quantity of "skunk weed" present at the Defendant's home on October 31, 2014. The Defendant raises two objections to the Court's consideration of Agent Douglass' belief. The Defendant first argues that Agent Douglass' belief about "skunk weed" was stale at the time of the search. ECF No. 68 at 9. As the Third Circuit has explained:

> Though a court should consider the age of information in determining whether there is adequate suspicion justifying a search, the court must ultimately determine whether the evidence is likely to be still found at the searched property. The likelihood that the evidence sought is still at the place to be searched depends on a number of variables, such as the nature of the crime, of the criminal, of the thing to be seized, and of the place to be searched.

*United States v. Strickland*, 237 F. App'x 773, 778 (3d Cir. 2007) (internal citations and quotations omitted). In general, courts have found that information related to ongoing drug dealing may not be stale even when many months have elapsed before a search. *See, e.g., United States v. Costa*, 736 F. Supp. 2d 859, 863 (D. Del. 2010) (holding that a seven month old affidavit was not stale when the "defendant was engaged, over several months in 2009, in a significant illegal drug distribution operation involving over 40,000 pills and approximately $900,000."); *United States v. Gorny*, 2014 WL 2860637, at *7 (W.D. Pa. June 23, 2014) (compiling cases). Here, Agent Douglass explained that on October 31, 2014, she "had information that [the Defendant] was selling marijuana," ECF No. 67 at 61:5-61:16, 64:3-64:6, and that she continued receiving such information on an ongoing basis until she searched the

11

house. Accordingly, the (not even) four month gap between the time when Agent Douglass believed she smelled the "skunk weed" and the search does not render the "skunk weed" information legally stale, especially in the context of everything else Agent Douglass knew.

Alternatively, the Defendant argues that Agent Douglass' belief that she smelled "skunk weed" cannot be considered because she did not explicitly testify about any experience or training she had "in the detection of marijuana odors." ECF No. 68 at 9. The Defendant, however, does not cite to any federal cases (in this Circuit or elsewhere) which state that such information must be put on the record before an agent's conclusion is to be credited. Although Agent Douglass did not delineate her experience with smelling "skunk weed," she did testify that she was certain the smell she experienced on October 31, 2014 was attributable to "skunk weed" and not to skunks themselves, as the Defendant claimed. The Court recognizes that a major thrust of the jurisprudence involving the development of the reasonable suspicion standard is the idea that law enforcement should be able to make conclusions based on their experience. *See e.g.*, *Terry v. Ohio*, 392 U.S. 1, 27 (1968) ("[I]n determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the *specific reasonable inferences which he is entitled to draw from the facts in light of his experience*.") (emphasis added). Thus, the Court believes it appropriate to take Agent Douglass at her word and conclude that after over twenty years as a parole agent, she reasonably believed that the smell she experienced was "skunk weed" and not a skunk.

Second, Agent Douglass knew that the Defendant had admitted to failing a drug test administered by his employer because he had marijuana in his system. Although a failed drug test in and of itself does not constitute direct evidence of drug *dealing*, and the Defendant claimed he inadvertently ingested the marijuana, a failed drug test also permits the reasonable

12

inference that the Defendant at the very least had access to marijuana. Given that in this case Agent Douglass was receiving information that the Defendant was selling marijuana and that she believed she had previously smelled marijuana in his home, the fact that he tested positive for ingesting the same drug reasonably further raised Agent Douglass' suspicion that he was in fact dealing it.

In addition to Agent Douglass' information that the Defendant was dealing marijuana, Agent Douglass' reasonable belief that she smelled a large amount of marijuana at the Defendant's house, and the fact that the Defendant admitted to failing a marijuana drug test, Agent Douglass also knew that the Defendant was not being forthright with her about numerous material things, in spite of the conditions of his supervised release. The Defendant did not inform Agent Douglass of his move out of his sister's house until after it had occurred, even though he was supposed to tell her about any plans to move before they occurred. Similarly, the Defendant did not tell Agent Douglass that he was moving away from the house he purchased from his brother. Additionally, Agent Douglass believed that the Defendant had lied to her about why he was fired from his job. Although these occurrences are not crimes in and of themselves, the Court can consider such information in its reasonable suspicion analysis. The Third Circuit has clarified that "reasonable suspicion does not require that the suspect's acts must always be themselves criminal. In many cases the Supreme Court has found reasonable suspicion based on acts capable of innocent explanation." *United States v. Valentine*, 232 F.3d 350, 356 (3d Cir. 2000).

On top of everything else, Agent Douglass also testified that the Defendant was associating with Quienty Henley and Jarron Bell, two felons who she "had good indications...were still doing illegal activities, particularly drug sales." ECF No. 67 at 44:12-

44:14. Specifically, Agent Douglass knew that the Defendant had sold his house to Bell, who she knew was under investigation with the FBI for trafficking heroin. *Id.* at 62:19-63:12. In *U.S. v. Stearn*, 597 F.3d 540 (3d Cir. 2010), the Third Circuit explained that the defendant's "conspicuous association" with a "known drug dealer" supported "the inference that [the defendant] was involved in the drug trade." 597 F.3d at 566. Therefore, Agent Douglass' knowledge about Quienty Henley and Jarron Bell reasonably helped motivate Agent Douglass' suspicion that the Defendant was dealing marijuana.

Finally, Agent Douglass' belief that the Defendant was spending more money than he was making, especially given that he began working less, is also relevant to whether or not Agent Douglass' suspicion that the Defendant was dealing marijuana was reasonable. Although Agent Douglass might have tried to investigate the Defendant's financial circumstances more thoroughly, her observation about his increasing spending habits in conjunction with his diminishing work habits reasonably led to the inference that the Defendant was acquiring significant money in a manner separate from his job. The fact that there could have been an innocent explanation for the Defendant's seemingly enhanced positive cash flow does not change the Court's conclusion. *See United States v. Davilla*, 69 F. App'x 537, 540 (3d Cir. 2003) ("The fact that each of the observations of the parole authorities is by itself readily susceptible to an innocent explanation is entitled to no weight.").

Considering all of the above-discussed factors in totality, the Court concludes that Agent Douglass had reasonable suspicion to search the Defendant's house on February 23, 2015.[8]

---

[8] Although the parties focus their arguments on whether there was reasonable suspicion to believe that the Defendant was dealing marijuana, the Court also concludes, as is required by § 6153(d)(2), that there was reasonable suspicion to believe that evidence of the Defendant's criminal activities would specifically be found *in his house* on February 23, 2015. The Third Circuit, along with many other circuits, has often held that "evidence is likely to be found where the drug dealers reside." *United States v. Burton*, 288 F.3d 91, 103 (3d Cir. 2002) (internal alterations and quotations omitted). Additionally, and more specifically, in this case, Agent Douglass smelled the "skunk weed"

14

Although the circumstances discussed might not meet the more demanding probable cause standard, in this case, when the Court considers the fact that Agent Douglass was receiving information about the Defendant's drug dealing, the fact that the Defendant admitted to having marijuana in his system, the fact that Agent Douglass believed she smelled "skunk weed" in the Defendant's home, and the facts that the Defendant was lying to her, associating with people Agent Douglass had reason to believe were drug dealers, and appeared to be spending a lot of money (inconsistent with his diminished lawful work), the Court concludes that the less demanding reasonable suspicion standard has been fulfilled.

Given that the Court concludes that Agents Douglass, Fine and Sartori had the requisite reasonable suspicion to search the Defendant's residence under § 6153(d)(2), the Court will continue by considering the events that unfolded once they entered it. According to the testimony presented to the Court, the agents handcuffed the Defendant upon entering the house. Such action was permissible under 61 Pa.C.S. § 6153(d)(5), which states that "[t]he offender may be detained if he is present during a property search."

Agent Sartori then informed the Defendant that he was going to search him and asked the Defendant if he had anything on his person that could harm Agent Sartori. Agent Sartori testified that at this juncture, the Defendant responded by saying that he had been smoking marijuana and had placed it in the kitchen cabinet. The Defendant moves to suppress this statement on the grounds that it was obtained in violation of his *Miranda* rights. In general, *Miranda* applies to all "custodial interrogations [...] unless [the United States] demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384

---

in the Defendant's home, leading to a reasonable suspicion that the Defendant stored evidence of his drug dealing there.

U.S. 436, 444 (1966). In this case, the Defendant's *Miranda* rights were not violated and his statement will not be suppressed. First, the Defendant was not in custody when he made his statement. In order for a person to be considered in custody, there must be a [']restraint on freedom of movement of the degree associated with a formal arrest.[']" *United States v. McNeil*, 416 F. App'x 227, 228 (3d Cir. 2011) (citations omitted). The Third Circuit has identified five factors that must be considered to make such determination:

> (1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning.

*United States v. Willaman*, 437 F.3d 354, 359–360 (3d Cir.2006). Here, the Defendant was not in custody. He was not told that he was under arrest (in fact, he was told only that he was going to be handcuffed while the agents searched), he was located in his own home, there were only three agents in the house, there were no weapons being pointed at him, and he had been handcuffed for a short period of time when the statement occurred.[9] *See United States v. Killingsworth*, 118 F. App'x 649, 651 (3d Cir. 2004) (explaining that "the fact that the incident took place in [the defendant's] home undermines a claim that he was in custody" and that "courts have found interrogations lasting anywhere from one and one-half to seven hours to be non-custodial.").

However, even if the Defendant were to be considered in custody at the time of his statement, his *Miranda* rights were still not violated because his statement was not the result of an "interrogation." According to the Supreme Court, "the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police

---

[9] In his testimony, Agent Sartori said that the Defendant made the statement within minutes of the agents being in the house. ECF No. 67 at 29:3-29:8. In her testimony, Agent Douglass said that she believed the statement was made after approximately fifteen to twenty minutes. *Id.* at 77:16-77:20; 91:16-91:19. Regardless of which of these time estimates the Court considers, its conclusion that the Defendant was not in custody remains the same.

16

(other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). Here, what Agent Sartori did was ask the Defendant if he had anything on him that would "hurt," "cut" or "stick" Agent Sartori—a question that related to ensuring Agent Sartori's own personal safety and nothing else. It was not a question that Agent Sartori should have known would elicit any sort of incriminating response from the Defendant (particularly one about having placed a partially-smoked marijuana cigarette in the kitchen cabinet). Thus, because the Defendant was neither in custody at the time of his statement, nor subject to interrogation, his *Miranda* rights were not violated and his statement will not be suppressed.

Accounting for the fact that the agents had reasonable suspicion to search the Defendant's house and for the fact that the Defendant voluntarily informed Agent Sartori that there was marijuana in the kitchen cabinet (contraband which the parole agents were permitted to seize), the agents' attendant discovery of the marijuana and digital scale in the kitchen cabinet was lawful. Such items will not be suppressed.

Alternatively, the Court also notes that its conclusion as to the marijuana and digital scale in the kitchen and the Defendant's statement would be remain unchanged even if the Court were to conclude that the agents did not have reasonable suspicion to search the house when they entered it. As the Defendant's parole officer, Agent Douglass (along with the other agents) could have entered the house for a routine and unannounced home visit, just as she appears to have done on October 31, 2014. ECF No. 67 at 61:5-61:16; *see* Pennsylvania Board of Probation and Parole, *Home Plan Brochure* (May 2015), *available at* http://www.pbpp.pa.gov/ Information/Documents/Publications/Home%20Plan%20brochure%20FINAL%20COLOR.pdf

17

("Parole supervision staff will conduct visits to the residence after the offender is paroled to the approved home plan. Such visits will occur unannounced and at any time."). In this case, the agents did not find any evidence sought to be suppressed until after the Defendant told Agent Sartori about the marijuana in the kitchen, so there would not be any "fruits" to suppress from an allegedly unlawful search occurring prior to that. Once the Defendant made his statement that there was marijuana in the kitchen cabinet,[10] *see supra* p. 15-17, the agents had the requisite reasonable suspicion to search the kitchen cabinet and find the marijuana and scale. Therefore, such evidence would not be suppressed in any event.

The Court notes that both Agents Sartori and Douglass testified that the reason they went to and entered the Defendant's house on February 23, 2015 was to search it for evidence of marijuana dealing. *Id.* at 11:2-11:4, 133:14-133:23. However, the agents' subjective intent does not change the fact that the agents could have entered the Defendant's house for a routine home visit. As explained by the Supreme Court, "[a]n action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances, viewed *objectively,* justify [the] action. The officer's subjective motivation is irrelevant." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 404 (2006) (emphasis in original) (internal quotations and citations omitted). Therefore, even if the agents did not have the requisite reasonable suspicion to search the Defendant's house immediately upon entry, they did have it to look in the kitchen cabinet when the Defendant told them his half-smoked joint was in there. Neither the marijuana, the digital scale, nor the Defendant's statement will be suppressed.

---

[10] The Court notes that the nature of the Defendant's statement would not change had the agents not had the requisite reasonable suspicion to search his house upon entering it. In either scenario, the Defendant was not subject to a "custodial interrogation," and his statement was made voluntarily. *See supra* p. 15-17.

18

## B.    The Events Following the Parole Agents' Search of the Defendant's House

After the agents recovered the marijuana and digital scale, they stopped their search and told the Defendant that they were going to obtain a search warrant. According to their uncontradicted testimony, they also informed him numerous times that he should not talk to them until the local police arrived. The Defendant, however, did not heed such instruction and stated that he had a firearm upstairs. Eventually, the Defendant was taken to the local police station, and law enforcement obtained a warrant to search the house. They conducted a search and discovered $2,170.00 in U.S. currency, 275.1 grams of marijuana in one large plastic bag containing 9 smaller bags individually packaged, 529.3 grams of marijuana in a vacuum-sealed package, two scales, a marijuana grinder, a Taurus .45 caliber pistol, ammunition, three cellular phones and other electronic devices. The Defendant seeks to suppress everything that law enforcement recovered during the warrant-based search, as well as his statement that he had a firearm in the house.

In regards to his statement, the Defendant once again argues that his *Miranda* rights were violated and that his statement was involuntary. The Court concludes otherwise. As above, the Defendant was not subject to a "custodial interrogation" when he made his statement. He was not under arrest, he was sitting in his own home, there were only three agents present, and the agents did not have any weapons drawn. ECF No. 67 at 30:18-30:21; *see Willaman,* 437 F.3d at 359–360. Additionally, the Defendant was not subject to an interrogation. In fact, according to the only testimony presented to the Court, he was not asked *any* questions before he made his statement about the gun. It was completely voluntary. *See Innis*, 446 U.S. at 301. Thus, the Defendant's statement that there was a firearm in the upstairs portion of his home will not be suppressed.

19

Finally, the Court must consider whether the search warrant that allowed law enforcement to search the Defendant's house was supported by probable cause. Probable cause exists when "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). "A magistrate's determination of probable cause should be paid *great deference* by reviewing courts." *United States v. Conley*, 4 F.3d 1200, 1205 (3d Cir. 1993) (emphasis in original) (internal quotations omitted). In fact, "a reviewing court is to uphold the warrant as long as there is a substantial basis for a fair probability that evidence will be found." *Id.* This standard "mean[s] that the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to [the authorizing judge's conclusion]." *United States v. Jones*, 994 F.2d 1051, 1055 (3d Cir. 1993) (internal quotations omitted).

In this case, the affidavit supporting the application for the search warrant explained that the parole agents had already observed marijuana and a scale in the Defendant's house and that the Defendant had "admitted to having a firearm in the residence." ECF No. 54-6. Based on this information, the Court concludes that there was a substantial basis for the magistrate judge to determine that there was a fair probability that drugs and firearms would be found at the Defendant's house. Not only had the parole agents already found drugs at the house, giving the magistrate judge a substantial basis to conclude that there was a fair probability that more would be found, but the Defendant had actually confessed to possessing a firearm that was located in the house. As far as evidence supporting a magistrate's probable cause determination goes, it seems to the Court that such evidence is particularly strong in this case. Accordingly, the Court concludes that the search warrant was valid and that none of the evidence found during the search of the Defendant's residence will be suppressed.

20

## C.    The Defendant's Motion for Discovery

The United States simply and generally asserts that it has fulfilled all mandated discovery/disclosure obligations, but provides no detail, nor does it specifically address any of the Defendant's requests. ECF No. 59 at 1-2. The Defendant has not filed any papers in reply challenging that broad assertion. Nonetheless, the Court will address the matters set out in the Defendant's Motion for Discovery, ECF No. 55, and will do so by reference to the numbered paragraphs of that Motion.

As to paragraphs 3 (a), (b), (c), (d), (e), (g), (i), and (u), such matters are, as the Defendant notes, expressly addressed by Fed. R. Crim. P. 16. The Defendant has made no assertions in this Court that the United States has to date failed to comply with Rule 16 in such regards, and the United States has asserted without contradiction that it has so complied, so to the extent of those subparagraphs, the Motion is denied without prejudice.

As to paragraphs 3(f), (k), (l), (m), (n), (p),  (s), and (t),  the obligations of the United States to determine what responsive information it has, and to disclose such evidence to the extent that it is actually or potentially exculpatory or which could reasonable call into question the credibility of any witness and is in the possession or control of the Government or law enforcement are established by the long-standing case law referenced in the Defendant's Motion and are continuing obligations. The United States has stated that it has fulfilled such disclosure obligations to date, and its disclosure obligations exist and continue whether this Court orders it or not, so to that extent the Motion is denied without prejudice.

As to paragraph 3(h), the Court has by prior Order directed the preservation of "rough notes." ECF No. 57. As to the requests contained in paragraphs 3 (j) and (o), the disclosure obligations of the United States as to trial witnesses and informants is quite limited. *See Weatherford v. Bursey*, 429 U.S. 545, 559 (1977) ("There is no general constitutional right to

21

discovery in a criminal case."). Here, the Defendant has not cited to any binding case law that

persuades the Court that the information he is requesting must be provided to him by the

Government at this juncture, nor has he provided the Court with any particular reasons why such

information should be specially provided to him in this case at this point. [11] Accordingly, to the

extent of paragraphs 3 (j) and (o), the Motion is denied without prejudice.

---

[11] In paragraph 3 (j), the Defendant cites to *Roviaro v. United States*, 353 U.S. 53 (1957) to support his request for information regarding informants and cooperating witnesses. In *Roviaro*, the Supreme Court discussed "the Government's privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law," 353 U.S. at 59, and explained that it was limited by considerations of fairness such that "[w]here the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." 353 U.S. at 60-61. In *United States v. Jiles*, 658 F.2d 194, the Third Circuit discussed *Roviaro* and explained:

> While there is no fixed rule as to when disclosure is required, the Court in Roviaro [sic] stated that once a defendant sets forth a specific need for disclosure the court should balance "the public interest in protecting the flow of information against the individual's right to prepare his defense." The result of the balancing will depend upon the particular circumstances of the case, "taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors."
>
> When applying this test, one of three types of cases may emerge. First, the court may be presented with an extreme situation, such as that in Roviaro [sic] itself, in which the informant played an active and crucial role in the events underlying the defendant's potential criminal liability. In these cases, disclosure and production of the informant will in all likelihood be required to ensure a fair trial. At the other end of the spectrum, are the cases in which the informant was not an active participant or eyewitness, but rather a mere tipster. In such cases, courts have generally held that the informant's identity need not be disclosed. A third group of cases falls between these two extremes and it is in this group that the balancing becomes most difficult.
> ...
> As mentioned, the first step in determining whether the identity of an informant must be disclosed is to ascertain what need, if any, the defendant has alleged for disclosure. The burden is on the defendant to show the need for disclosure.

658 F.2d at 196-97 (internal citations omitted).

Here, regardless of which of the three categories of cases the generic informants and cooperating witnesses noted in the Defendant's Motion would fall into in this case, the Defendant does not meet his burden of showing the need for disclosure. In fact, the Defendant does not cite to any reasons why he should be provided the information he seeks. Thus, beyond the Government's *Brady/Giglio* obligations, the Court cannot conclude that the Defendant is entitled to information about the United States' informants or cooperating witnesses (if any) at this point.

Similarly, in paragraph 3 (o), the Defendant cites to a Third Circuit case, *United States v. Addonizio*, 451 F.2d 49 (3d Cir. 1971), to support his request for a list of witnesses the Government might call at trial. However, in *Addonizio*, the Third Circuit explained that "[i]t is still firmly established, for example, that a defendant is entitled neither to a wholesale discovery of the Government's evidence, nor to a list of the Government's prospective witnesses." 451 F.2d at 64. Accordingly, the Court remains unconvinced that the Defendant is entitled to the list that he seeks.

As to paragraph 3(q), to the extent the requested witness statements are exculpatory, or go to the impeachment of a witness, the pre-existing disclosure obligations are addressed above. To the extent it seeks more, it is so vague that in the Court's estimation what it seeks cannot be discerned with any reasonable particularity, and will be denied on such grounds. As to paragraph 3(r), the Court will set a deadline for *Jencks* material in its pretrial order, and it is granted to that extent only.

III.    **CONCLUSION**

Defendant's Motion to Suppress Evidence is denied. None of the challenged physical evidence or statements shall be suppressed.[12] Defendant's Motion for Discovery is granted in part and denied in part.

An appropriate Order will issue.

Mark R. Hornak
United States District Judge

Dated:  May 16, 2017

cc:    All counsel of record

---

[12] In their papers, both parties discuss the warrant law enforcement obtained to search the cell phones found at the Defendant's property. However, there is nothing in the record that indicates that the cell phones were ever searched, and the Defendant is not asking that any evidence found on the cell phones be suppressed. Accordingly, the Court need not consider the validity of the warrant for the cell phone search.

23

AO 245B (Rev. 09/17)    Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

Western District of Pennsylvania

| | |
|---|---|
| UNITED STATES OF AMERICA<br>**v.**<br><br>DWIGHT D. HENLEY | **JUDGMENT IN A CRIMINAL CASE**<br><br>Case Number:    2:15-cr-199-1<br>USM Number:    35970068<br><br>GIUSEPPE G.C. ROSSELLI<br>Defendant's Attorney |

## THE DEFENDANT:

☒ pleaded guilty to count(s)    1 and 2

☐ pleaded nolo contendere to count(s) _____
which was accepted by the court.

☐ was found guilty on count(s) _____
after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. 922(g)(1)<br>and 924(e) | POSSESSION OF A FIREARM AND/OR AMMUNITION<br>BY A CONVICTED FELON | 2/23/2015 | 1 |
| 21 U.S.C. 841(a)(1)<br>and 841(b)(1)(D) | POSSESSION WITH INTENT TO DISTRIBUTE MARIJUANA<br>A SCHEDULE I CONTROLLED SUBSTANCE | 2/23/2015 | 2 |

The defendant is sentenced as provided in pages 2 through    7    of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☒ Count(s)    3    ☒ is    ☐ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

2/15/2018
Date of Imposition of Judgment

_____
Signature of Judge

MARK R. HORNAK, UNITED STATES DISTRICT JUDGE
Name and Title of Judge

2/15/2018
Date

AO 245B (Rev. 09/17) Judgment in Criminal Case
    Sheet 2 — Imprisonment

| | | Judgment — Page | 2 | of | 7 |

DEFENDANT:     DWIGHT D. HENLEY
CASE NUMBER:     15-199-1

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:

ONE-HUNDRED AND NINETY-NINE (199) MONTHS AT COUNT 1, AND ONE-HUNDRED AND TWENTY (120) MONTHS AS TO COUNT 2, TO RUN CONCURRENT WITH ONE ANOTHER.

☒ The court makes the following recommendations to the Bureau of Prisons:

    THAT THE DEFENDANT BE INCARCERATED AS CLOSE AS POSSIBLE TO PITTBURGH, PA.

☒ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

    ☐ at _____ ☐ a.m. ☐ p.m.   on _____ .

    ☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐ before 2 p.m. on _____ .

    ☐ as notified by the United States Marshal.

    ☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245B (Rev. 09/17) Judgment in a Criminal Case
Sheet 3 — Supervised Release

| | | Judgment—Page | 3 | of | 7 |

DEFENDANT:    DWIGHT D. HENLEY
CASE NUMBER:    15-199-1

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of :

FIVE (5) YEARS AS TO COUNT 1, AND FIVE (5) YEARS AS TO COUNT 2, TO RUN CONCURRENT
WITH ONE ANOTHER.

## MANDATORY CONDITIONS

1.  You must not commit another federal, state or local crime.
2.  You must not unlawfully possess a controlled substance.
3.  You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from
    imprisonment and at least two periodic drug tests thereafter, as determined by the court.
    ☐ The above drug testing condition is suspended, based on the court's determination that you
    pose a low risk of future substance abuse. *(check if applicable)*
4.  ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of
    restitution. *(check if applicable)*
5.  ☒ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6.  ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, *et seq.*) as
    directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you
    reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7.  ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached
page.

AO 245B (Rev. 09/17)   Judgment in a Criminal Case
Sheet 3A — Supervised Release

| | | | | Judgment—Page | 4 | of | 7 |

DEFENDANT:        DWIGHT D. HENLEY
CASE NUMBER:   15-199-1

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.   You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.   After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.   You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.   You must answer truthfully the questions asked by your probation officer.
5.   You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.   You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.   You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.   You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.   If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10.  You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11.  You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12.  If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13.  You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____   Date _____

AO 245B(Rev. 09/17)    Judgment in a Criminal Case
                       Sheet 3D — Supervised Release

DEFENDANT:        DWIGHT D. HENLEY                    Judgment—Page ___5___ of ___7___
CASE NUMBER:      15-199-1

## SPECIAL CONDITIONS OF SUPERVISION

14) THE DEFENDANT SHALL PARTICIPATE IN A PROGRAM OF TESTING AND, IF NECESSSARY, TREATMENT FOR SUBSTANCE ABUSE, SAID PROGRAM TO BE APPROVED IN ADVANCE BY THE PROBATION OFFICER, UNTIL SUCH TIME AS THE DEFENDANT IS RELEASED FROM THE PROGRAM BY THE COURT. FURTHER, THE DEFENDANT SHALL BE REQUIRED TO CONTRIBUTE TO THE COSTS OF SERVICES FOR ANY SUCH TREATMENT IN AN AMOUNT DETERMINED BY THE PROBATION OFFICER, BUT NOT TO EXCEED THE ACTUAL COST. THE DEFENDANT SHALL SUBMIT TO ONE DRUG URINALYSIS WITHIN 15 DAYS AFTER BEING PLACED ON SUPERVISION AND AT LEAST TWO PERIODIC TESTS THEREAFTER.

15) IT IS FURTHER ORDERED THAT THE DEFENDANT SHALL NOT INTENTIONALLY PURCHASE, POSSESS AND/OR USE ANY SUBSTANCE(S) DESIGNED TO SIMULATE OR ALTER IN ANY WAY THE DEFENDANT'S OWN URINE SPECIMEN. IN ADDITION, THE DEFENDANT SHALL NOT PURCHASE, POSSESS AND/OR USE ANY DEVICE(S) DESIGNED TO BE USED FOR THE SUBMISSION OF A THIRD PARTY URINE SPECIMEN.

16) THE DEFENDANT SHALL SUBMIT HIS PERSON, PROPERTY, HOUSE, RESIDENCE, VEHICLE, PAPERS, BUSINESS OR PLACE OF EMPLOYMENT, TO A SEARCH, CONDUCTED BY A UNITED STATES PROBATION OR PRETRIAL SERVICES OFFICER AT A REASONABLE TIME AND IN A REASONABLE MANNER, BASED UPON, BASED UPON REASONABLE SUSPICION OF CONTRABAND OR EVIDENCE OF A VIOLATION OF A CONDITION OF SUPERVISION. FAILURE TO SUBMIT TO A SEARCH MAY BE GROUNDS FOR REVOCATION. THE DEFENDANT SHALL INFORM ANY OTHER RESIDENTS THAT THE PREMISES MAY BE SUBJECT TO SEARCHES PURSUANT TO THIS CONDITION.

17) THE DEFENDANT SHALL PARTICIPATE IN THE UNITED STATES PROBATION OFFICE'S WORKFORCE DEVELOPMENT PROGRAM AS DIRECTED BY THE PROBATION OFFICER.

18) THE DEFENDANT SHALL COOPERATE IN THE COLLECTION OF DNA AS DIRECTED BY THE PROBATION OFFICER, PURSUANT TO 28 C.F.R. § 28.12, THE DNA FINGERPRINT ACT OF 2005, AND THE ADAM WALSH CHILD PROTECTION AND SAFETY ACT OF 2006.

19) THE DEFENDANT SHALL FORFEIT TO THE UNITED STATES THE FOLLOWING PROPERTY: (1) .45 CALIBER SEMI-AUTOMATIC TAURUS PISTOL, BEARING SERIAL NUMBER NSC30338 (2) .45 CALIBER AMMUNITION (3) 9MM CALIBER AMMUNITION (4) 3 CELL PHONES (5) 2 I-PADS (6) 1 LAPTOP AND (7) $2,170 IN UNITED STATES CURRENCY.

AO 245B (Rev 09/17)   Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

Judgment — Page ___6___ of ___7___

DEFENDANT:          DWIGHT D. HENLEY
CASE NUMBER:        15-199-1

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | JVTA Assessment* | Fine | Restitution |
|---|---|---|---|---|
| **TOTALS** | $ 200.00 | $ 0.00 | $ 0.00 | $ 0.00 |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |

| | | |
|---|---|---|
| **TOTALS** | $ _____ | $ _____ |

☐ Restitution amount ordered pursuant to plea agreement  $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ the interest requirement is waived for the   ☐ fine   ☐ restitution.

☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B (Rev. 09/17)    Judgment in a Criminal Case
                 Sheet 6B — Schedule of Payments

Judgment—Page    7    of    7

DEFENDANT:         DWIGHT  D. HENLEY
CASE NUMBER:       15-199-1

## ADDITIONAL FORFEITED PROPERTY

THE DEFENDANT SHALL FORFEIT TO THE UNITED STATES THE FOLLOWING PROPERTY: (1) .45 CALIBER SEMI-AUTOMATIC TAURUS PISTOL, BEARING SERIAL NUMBER NSC30338 (2) .45 CALIBER AMMUNITION (3) 9MM CALIBER AMMUNITION (4) 3 CELL PHONES (5) 2 I-PADS (6) 1 LAPTOP AND  (7) $2,170 IN UNITED STATES CURRENCY.

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENT

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 5970 total words.

2. This brief complies with the type-face requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. (a)(6) because this brief has been prepared in a monospaced type face using Microsoft Word with size 14 font in Times New Roman type style.

/s Giuseppe GC Rosselli

Giuseppe GC Rosselli
PA ID No. 87248

Law Office of Giuseppe GC Rosselli
660 Lincoln Avenue
Suite 107
Pittsburgh, Pa 15202
(412) 281-8008
(412) 774-8008 (fax)

August 10, 2018                                Counsel for Dwight D. Henley

## CERTIFICATE OF BAR MEMBERSHIP

I certify that I am a member in good standing of the United States Court of Appeals for the Third Circuit.

## CERTIFICATION OF VIRUS CHECK

I certify that a virus check of the E-Brief has been conducted using Norton Security Anti-Virus 7.8 and that no electronic viruses exist in this E-Brief.

## CERTIFICATION OF IDENTICAL COMPLIANCE OF BRIEFS

I certify and verify that the text of the E-Brief and the Hard Copies of the Brief for Appellant that were filed with the Clerk are identical.

/s Giuseppe GC Rosselli

Giuseppe GC Rosselli
PA ID No. 87248

Law Office of Giuseppe GC Rosselli
660 Lincoln Avenue
Suite 107
Pittsburgh, Pa 15202
(412) 281-8008
(412) 774-8008 (fax)

August 10, 2018                          Counsel for Dwight D. Henley

## CERTIFICATE OF SERVICE

I hereby certify that seven hard copies of the Brief for Appellant and four copies of the Appendix were sent to the Office of the Clerk for the Third Circuit Court of Appeals on the same day the E-Brief was electronically filed.   I also hereby certify that a true and correct copy of the Brief For Appellant and the Appendix were served via U.S. Mail, postage prepaid, first class, this 7th day of August, 2018, upon the following:

Laura S. Irwin, Esquire
Assistant United States Attorney
U.S. Post Office and Courthouse
Suite 4000
Pittsburgh, PA 15219

/s Giuseppe GC Rosselli

Giuseppe GC Rosselli
PA ID No. 87248

Law Office of Giuseppe GC Rosselli
660 Lincoln Avenue
Suite 107
Pittsburgh, Pa 15202
(412) 281-8008
(412) 774-8008 (fax)

August 10, 2018                    Counsel for Dwight D. Henley