No. 18-1428

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

UNITED STATES OF AMERICA

v.

DWIGHT HENLEY,

Appellant

Appeal from Judgment of Conviction
Entered by the United States District Court
for the Western District of Pennsylvania
at Criminal No. 15-199 (Hornak, J.)

**RESPONSE BRIEF FOR THE UNITED STATES OF AMERICA**

SCOTT W. BRADY
United States Attorney

DONOVAN COCAS
Assistant U.S. Attorney

700 Grant Street, Suite 4000
Pittsburgh, Pennsylvania
Tel:    (412) 894-7389
Fax:    (412) 644-6995

Email: donovan.cocas@usdoj.gov

# **TABLE OF CONTENTS**

**Pages**

JURISDICTION ...................................................................................1

ISSUE PRESENTED AND STANDARD OF REVIEW ..............................2

STATEMENT OF FACTS ........................................................................3

SUMMARY OF ARGUMENT....................................................................12

ARGUMENT

       I.      HENLEY, A PAROLEE, HAS NOT SHOWN THAT THE DISTRICT COURT ERRED IN DENYING HIS MOTION TO SUPPRESS THE GUN AND MARIJUANA SEIZED AFTER A SEARCH OF A HOME HE HAD BOUGHT SURREPTITIOUSLY............................................................ 13

CONCLUSION...........................................................................................26

CERTIFICATES OF COMPLIANCE AND SERVICE

# **TABLE OF CITATIONS**

**Federal Cases**                                                    **Pages**

Griffin v. Wisconsin,
   483 U.S. 868 (1987) ..................................................................13

Jones v. Johnson,
   230 F.3d 825 (5th Cir. 2000) ............................................... 18, 20

Kramer v. City of Jersey City,
   455 F. App'x 204 (3d Cir. 2011) ...............................................25

Morrissey v. Brewer,
   408 U.S. 471 (1972) ..................................................................25

Pa. Bd. of Prob. & Parole v. Scott,
   524 U.S. 357 (1998) ..................................................................19

Samson v. California,
   547 U.S. 843 (2006) ........................................................... 12, 14

Shea v. Smith,
   966 F.2d 127 (3d Cir. 1992) ......................................................15

United States v. Alston,
   626 F.3d 397 (8th Cir. 2010) .....................................................22

United States v. Angulo-Lopez,
   791 F.3d 1394 (9th Cir. 1986) ...................................................24

United States v. Arvizu,
   534 U.S. 266 (2002) ..................................................... 12, 13, 15

United States v. Baker,
   221 F.3d 438 (3d Cir. 2000) ................................. 12, 14, 16, 22

United States v. Ball,
   282 F. App'x 126 (3d Cir. 2008) ..............................................21

United States v. Caple,
   403 F. App'x 656 (3d Cir. 2010) ..............................................23

United States v. Carter,
   566 F.3d 970 (11th Cir. 2009) ...................................................23

United States v. Cintron,
   243 F. App'x 676 (3d Cir. 2007) ..............................................23

United States v. Collins,
   683 F. App'x 776 (11th Cir. 2017)..........................................................20
United States v. Delfin-Colina,
   464 F.3d 392 (3d Cir. 2006) ..................................................................15
United States v. Eggleston,
   243 F. App'x 715 (3d Cir. 2007).............................................................18
United States v. Fisher,
   322 F. App'x 207 (3d Cir. 2009).............................................................22
United States v. Fleetwood,
   235 F. App'x 892 (3d Cir. 2007)...................................................... 15, 17
United States v. Gay,
   724 F. App'x 122 (3d Cir. 2018).............................................................14
United States v. Gragg,
   576 F. App'x 656 (8th Cir. 2014)............................................................25
United States v. Greany,
   929 F.2d 523 (9th Cir. 1991) .................................................................25
United States v. Green,
   897 F.3d 173 (3d Cir. 2018) ..................................................................26
United States v. Hamilton,
   708 F.2d 1412 (9th Cir. 1983)......................................................... 18-19
United States v. Harvey,
   2 F.3d 1318 (3d Cir. 1993) ............................................................ 17, 19
United States v. Hayes,
   603 F. App'x 74 (3d Cir. 2015)...............................................................21
United States v. Hill,
   967 F.2d 902 (3d Cir. 1992) ........................................................... 13, 18
United States v. Jackson,
   849 F.3d 540 (3d Cir. 2017) ....................................................................2
United States v. Johnson,
   93 F. App'x 416 (3d Cir. 2004).................................................... 15, 16, 22
United States v. Knights,
   534 U.S. 112 (2001) ..................................................................... 15, 16
United States v. Lynch,
   459 F. App'x 147 (3d Cir. 2012).............................................................18

United States v. Marcano,
   508 F. App'x 119 (3d Cir. 2013)...............................................................21

United States v. Myers,
   308 F.3d 251 (3d Cir. 2002) .........................................................................3

United States v. Navedo,
   694 F.3d 463 (3d Cir. 2012) .......................................................................15

United States v. Perminter,
   2012 WL 273349 (W.D. Pa. Jan. 30, 2012) ...............................................21

United States v. Pond,
   523 F.2d 210 (2d Cir. 1975) .......................................................................21

United States v. Ramsey,
   1995 WL 241488 (9th Cir. Apr. 24, 1995)................................................24

United States v. Rickus,
   737 F.2d 360 (3d Cir. 1984) .......................................................................14

United States v. Riley,
   706 F. App'x 956 (11th Cir. 2017)............................................................17

United States v. Roach,
   582 F.3d 1192 (10th Cir. 2009)..................................................................24

United States v. Strickland,
   237 F. App'x 773 (3d Cir. 2007).................................................................18

United States v. Tehfe,
   722 F.2d 1114 (3d Cir. 1983) .................................................. 19, 23, 25, 26

United States v. Tiem Trinh,
   665 F.3d 1 (1st Cir. 2011) ..........................................................................23

United States v. Toliver,
   183 F. App'x 745 (10th Cir. 2006)............................................................18

United States v. Valentine,
   232 F.3d 350 (3d Cir. 2000) .......................................................................14

United States v. Vosburgh,
   602 F.3d 512 (3d Cir. 2010) .......................................................................19

United States v. Williams,
   124 F.3d 411 (3d Cir. 1997) .......................................................................23

United States v. Williams,
   417 F.3d 373 (3d Cir. 2005) .................................................................. 15, 17

United States v. Yokshan,
  432 F. App'x 170 (3d Cir. 2011) .................................................................19
United States v. Yusuf,
  461 F.3d 374 (3d Cir. 2006) .......................................................................19
United States v. Zimmerman,
  277 F.3d 426 (3d Cir.2002) .......................................................................19

## **Federal Statutes**                          **Pages**

18 U.S.C. §922 ................................................................................................11
18 U.S.C. §924 ................................................................................................11

## **State Rules and Statutes**              **Pages**

61 Pa. C.S. §6153 ......................................................................................8, 14

No. 18-1428

———————————

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————————

UNITED STATES OF AMERICA

v.

DWIGHT HENLEY,

Appellant

———————————

Appeal from Judgment of Conviction
Entered by the United States District Court
for the Western District of Pennsylvania
at Criminal No. 15-199 (Hornak, J.)

———————————

**RESPONSE BRIEF FOR THE UNITED STATES OF AMERICA**

———————————

## JURISDICTION

Appellant Dwight Henley takes this timely appeal from the judgment of conviction entered on February 15, 2018.  See A.1.  The district court had jurisdiction, see 18 U.S.C. §3231, as does this Court.  See 28 U.S.C. §1291.[1]

---

[1] All references to "A." shall refer to the Appendix that Henley filed in support of his Opening Brief ("Br.").  Citations to "Dkt.No." refer to entries on the district court docket.  Citations to "PSR" shall refer to the Presentence Investigation Report prepared by the United States Probation Office before sentencing.  Finally, "SA." shall refer to the Supplemental Appendix.

1

## ISSUE PRESENTED AND STANDARD OF REVIEW

On appeal, Henley raises one issue.  Succinctly, that issue is this: did the district court err when it denied Henley's motion to suppress on the ground that state parole officers had reasonable suspicion to search his residence?

Henley preserved this issue.  <u>See</u> A.24-46.

This Court reviews the "denial of a suppression motion for clear error as to the underlying facts, but exercise[s] plenary review as to its legality in light of the district court's properly found facts."  <u>United States v. Jackson</u>, 849 F.3d 540, 544 (3d Cir. 2017) (citation omitted).

## STATEMENT OF FACTS

In reviewing the denial of a motion to suppress, this Court must construe the facts in the light most favorable to the Government and draw reasonable inferences from the evidence.  See United States v. Myers, 308 F.3d 251, 255 (3d Cir. 2002).  But because Henley's "Concise Statement of the Facts" summarizes the evidence in the light most favorable to himself and is argumentative besides, it is unhelpful.  See A.4-11.  The following Statement of the Facts is faithful to the prevailing standard of review.

**I.    December 1997-July 2012: After Accumulating A Lengthy Criminal Record For Drug And Vehicular Crimes, Henley Is Paroled In Pennsylvania And Shows Promise Early.**

From the age of 18 on, Henley racked up conviction after conviction for drug possession, drug distribution, and vehicular crimes.  See PSR ¶¶29-39.  After cycling in and out of prison for most of the early 2000s, by March 2012 Henley was paroled to the supervision of Joyce Douglass, a State Parole Agent with the Pennsylvania Board of Probation and Parole.  See A.76, A.108.  Agent Douglass had 25 years of experience as a parole officer, and she knew Henley because she had supervised him during one of his earlier unsuccessful stints on parole.  See A.107-08.

When Henley left state prison in March 2012, he assured Agent Douglass that he wanted to leave his criminal past behind.  See A.108.  Douglass was encouraged by Henley's resolution to mend his ways.  See A.107-08.  Although Douglass was somewhat uneasy because Henley had moved back to his old Clairton neighborhood where people were selling drugs, her concerns were assuaged somewhat when she learned that he intended to live with his sister and mother, where he had a support system in place.  See A.108-10.

3

Because Agent Douglass believed Henley was sincere, she encouraged him by helping him with ministerial tasks he needed to perform to get his driver's license back.  See A.108-09.  During this errand, Douglass learned that Henley owed about $4,600 in fines that he needed to pay before his driving privileges could be restored.  See A.124.  When Henley was ticketed for driving without a license in July 2012, Douglass interceded "because this was still earlier on when [she] thought he was doing well," and the ticket was reduced to a fine.  See A.117-18.

Despite this hiccup, Henley showed early promise: he began exercising and landed two jobs, and then, in July 2012, obtained a better-paying job at a company called MPW Industrial Services, where he made $11 per hour.  See A.109-11, A.115, A.218.  Initially, Henley worked full time and worked as much overtime as he could.  See A.121.  Agent Douglass "was really proud of him at the beginning" because Henley "was doing what he was supposed to be doing."  See A.109.

## II.    July 2012-October 2014: Though Henley Initially Flourishes On Parole, Agent Douglass Sees Troubling Signs That He Has Returned To His Old Ways.

By 2013, Agent Douglass learned that Henley had moved to a house on Pine Aly in Clairton.  See A.118.  Two things about this concerned Douglass: first, Henley only divulged his move after the fact, whereas the conditions of his supervision required him to inform Douglass beforehand.  See A.118.  And second, Henley claimed to have bought the house on Pine Aly from his brother, Quienty Henley (hereinafter, "Quienty") for $1.    See A.118.  Douglass had supervised Quienty after he, too, had been released from state prison, and she "had a lot of information from the street" which led her to believe that Quienty was still involved in criminal conduct.  See A.116, A.119.

4

When Agent Douglass entered Henley's new Pine Aly home, she saw a vest indicating that he had joined a local motorcycle club called Maxx'd Out Ryders. See A.120. This made Douglass uneasy because, although she knew little about the club, she knew that several parolees she had supervised were among its members. See A.120, A.123-24, A.196. When Douglass confronted Henley, he denied being a member of the club: even though elsewhere in the home Douglass spotted a photograph of him dressed in Maxx'd Out Ryders gear and posing with the club. See A.120, A.218.

Pedestrians do not join motorcycle clubs, and Henley was no exception: Agent Douglass discovered that he had acquired a motorcycle, two cars, a truck, and a boat, all without informing her beforehand, as he was required to do. See A.137, A.182-83, A.192, A.195. By June 2013, Henley used one of these vehicles to leave the state surreptitiously. See A.121-22. When Douglass telephoned Henley, he falsely told her that he had gone fishing somewhere in the district, when in truth he had gone with Maxx'd Out Ryders to an event in Virginia. See A.122-23. For this transgression, Douglass placed Henley on home monitoring for a month. See A.121-22, A.176, A.218.

In February 2014, Agent Douglass learned Henley had hired an attorney and paid off his traffic fines --- totaling nearly $5,000 by that point --- in one fell swoop. See A.124-25, A.186. Although payment of fines was a condition of Henley's supervision, his payment of them all at once made Douglass suspicious because this was a lot of money even for her, see A.125, A.186, and because she learned that Henley had scaled down his work at MPW to a part-time schedule, even though more work was available. See A.120-21.

When Agent Douglass dropped in to Henley's Pine Aly home to check up on him in March 2014, she noted that the front door had been "kicked in":

yet another detail Henley had not shared with her when it happened.  See A.125-27, A.190, A.218.  Henley explained that "somebody had broken into this apartment," but this explanation made Douglass suspicious because in her experience, parolees' modest homes were broken-into because of "drugs or money or guns."  See A.125, A.127, A.218.  Henley told Douglass that he planned to rent a house on Park Avenue, but said he was unsure when he would move because it was "being remodeled."  See A.125-26, A.132.

Over the two-year period since Henley's release from prison, Agent Douglass noted that he progressively became "more secretive."  See A.111.  When Douglass told Henley that she "didn't like what [she] was seeing," and "told him [she] thought he was spending more money than he was making" legitimately at MPW, see A.181, he replied that Douglass "just hear[d] a lot of things from people, and [didn't] know what [she] was talking about."  See A.121.  Henley "became very arrogant," telling Douglass that she "thought [she] knew everything" and challenging her to "prove it."  See A.121, A.218.

### III. October 2014-February 2015: After Agent Douglass Catches Henley In More Lies And Technical Violations And Learns He Is Selling Marijuana, She Prepares To Search His Home.

On October 31, 2014, Agent Douglass went to Pine Aly to check on Henley.  See A.128.  When she knocked on the door, eventually it was answered by a man named Jarron Bell.  See A.128.  Douglass knew Bell because he was another one of her supervisees at the time, but was taken aback because she never knew Henley to socialize with Bell and had never heard them talk about each other.  See A.125, A.128.  Bell told Douglass that he was waiting for Henley to come home.  See A.131.

Bell's explanation made superficial sense --- all of Henley's furniture was still in the Pine Aly house --- but the sight of Bell sitting there by himself

"without his shoes" on gave Agent Douglass the impression that he "was quite at home" there. <u>See</u> A.128. Moreover, Douglass believed that Bell was a heroin dealer because she knew he was the main target of an FBI investigation of a heroin-trafficking ring. <u>See</u> A.129-31. Meanwhile, Douglass's sources were telling her that Henley "was selling marijuana." <u>See</u> A.131, A.199-200.

Skeptical that Henley was still living at Pine Aly, Agent Douglass remembered his mention of the Park Avenue address and went there. <u>See</u> A.131. After discovering that Henley had given her the incorrect street number, Douglass eventually found the home on Park Avenue where he had moved without permission. <u>See</u> A.127, A.132. Contrary to his earlier representations, Henley was not merely renting the home but had purchased it: and it had two newly-remodeled bathrooms, flooring, carpeting, and brand-new furniture with the tags still on it. <u>See</u> A.132-33, A.173, A.184-85. This concerned Douglass, who knew that the new house, new furniture, two cars, truck, motorcycle, and boat Henley owned were inconsistent with the $11 per hour he earned working part-time at MPW. <u>See</u> A.132-33, A.137, A.218.

As Agent Douglass toured Henley's new house, when she walked into an enclosed back porch she "smelled a strong odor of marijuana." <u>See</u> A.137. Though Douglass said nothing, Henley volunteered that he had "a really bad skunk infestation under the porch." <u>See</u> A.137. Douglass knew the odor was "marijuana, not skunks," and she knew that the amount must be "at least a half a pound to a pound" because the odor was so strong. <u>See</u> A.138-39. Yet Douglass did not share her suspicions. <u>See</u> A.138.

Before departing and without telling Henley she had already been to Pine Aly looking for him, Agent Douglass inquired what he intended to do with his Pine Aly home. <u>See</u> A.131. Henley replied that "he didn't think he

would do anything" because the home "would be hard to get rid of."  See A.131.  The next day, however, Henley telephoned Douglass and confessed that he had sold the Pine Aly home to Bell.  See A.131.  Henley claimed that he had withheld this detail because he did not want to get Bell into trouble: an explanation that made no sense to Douglass.  See A.131, A.218.  Henley emphasized that he was not living at Pine Aly anymore.  See A.133.

Since at least March 2014, Agent Douglass had been receiving ongoing, "credible" information that Henley was dealing marijuana.  See A.199-200; see also SA.41.  In light of what Douglass knew or suspected, she sought and obtained permission from her supervisor to conduct a search of Henley's Park Avenue home after smelling marijuana there on October 31, 2014.[2]  See A.202.  But because of limited resources, and because suspected violations concerning heroin or guns were deemed more serious and took precedence, the search was postponed.  See A.202-03.

By January 2015, Henley was fired from his job at MPW.  Compare A.170-71 with PSR ¶65.  Henley informed Agent Douglass that he had been fired because a co-worker at MPW "had made brownies with marijuana in them for somebody else, and he had inadvertently eaten one of those and had tested positive for marijuana."  See A.115.  This story made no sense, however, because Henley had never tested positive for any drugs while under supervision.  See A.172; see also SA.40.  So when Douglass contacted MPW

---

[2] In Pennsylvania, a Parole Officer who has "reasonable suspicion that the real or other property in the possession of or under the control of the offender contains contraband or other evidence of violation of the conditions of supervision" may conduct a search of a parolee's property in non-exigent circumstances with the permission of a supervisor.  See 61 Pa. C.S. §6153(d).

to verify this account, she learned that Henley's story was untrue and that he actually had been fired for punching another employee.  See A.115-16.  In addition, Douglass heard that, in the wake of this altercation, Quienty had brought a gun to MPW.  See A.116-17, A.189.

## IV.  February 23, 2015: After Again Obtaining Permission To Conduct A Parole Search Of Henley's Park Avenue Home, Agent Douglass Finds Marijuana After Henley Confesses To Smoking It And, After A Warrant Is Obtained, Officers Find A Stolen Gun.

In early February 2015, Agent Douglass again obtained permission to conduct a parole search of Henley's home because she had "ongoing information" that he was still dealing marijuana.  See A.113, A.199-200. Once more, however, the search was postponed because the office was short-staffed handling pressing matters concerning heroin.  See A.113-14.  But finally, on February 23, 2015, Agent Douglass gathered Agents Ron Fine and John Sartori --- two fellow probation officers --- and proceeded to Park Avenue with the permission of her supervisor.  See A.114-15, A.135.

As Agent Douglass approached the Park Avenue home at about 8:40 a.m., she noted that the front door was wide open, even though it was February, and saw Henley sitting in the living room.  See A.135-36, A.145, A.149.  Douglass entered with Agents Fine and Sartori in tow, announced that she intended to search the house, and explained that while Henley was not under arrest, her colleagues would handcuff him for everyone's safety.  See A.79, A.138.  Douglass then walked to the back porch to see if she could still smell marijuana there and, smelling nothing, and returned.  See A.138-39.

While patting down and handcuffing Henley, and within minutes of entering the house, Agent Sartori asked whether he had anything on his person that could hurt or stick him.  See A.79, A.96, A.139.  Instead of answering

that question, Henley blurted out "that he had been smoking a joint, and the joint was in the kitchen cabinet." <u>See</u> A.80. After searching Henley's person and finding nothing of consequence, Sartori then sat him on a couch in the living room to wait with Agent Fine and went into the kitchen to look for the joint. <u>See</u> A.80. As Sartori opened the cabinet, he "could immediately smell the odor of marijuana." <u>See</u> A.82. The cabinet contained a baggie of marijuana and a digital scale. <u>See</u> A.82. The presence of the scale suggested that Henley was selling marijuana. <u>See</u> A.140.

Agent Sartori returned to the living room, told Henley that he had paused the search, and said he would obtain a search warrant before resuming it. <u>See</u> A.83.[3] When Henley began to speak, Sartori told him to say nothing until police arrived. <u>See</u> A.83. Henley kept interjecting, but each time Sartori interrupted him and cautioned him that any statements would be used against him in court. <u>See</u> A.83-84. At about 9:00 a.m. --- <u>i.e.</u>, just 20 minutes after the agents had entered the house --- Henley volunteered that "there was a firearm upstairs and that he had it for his protection." <u>See</u> A.84, A.144. Sartori again advised Henley to stop talking. <u>See</u> A.84-85.

Police arrived with a warrant to search the Park Avenue home at about 9:45 a.m. <u>See</u> A.157. Officers searching Henley's home seized two pounds of marijuana, the digital scale, a stolen Taurus handgun, and ammunition. <u>See</u> A.219. Within minutes, Agent Douglass transported Henley to the Clairton Police Department, where he was arrested and charged with drug- and firearms-related crimes. <u>See</u> A.153-55; <u>see also</u> PSR ¶51.

---

[3] While the law did not require this procedure, it was the policy of the Pennsylvania Board of Probation and Parole to seek a warrant in this situation out of an abundance of caution. <u>See</u> A.201.

**V.    September 2016 – February 2018: A Federal Grand Jury Indicts Henley And, After His Motion To Suppress Is Denied, He Takes A Conditional Guilty Plea And Appeals His Conviction.**

In September 2016, a Grand Jury in the Western District of Pennsylvania handed down a three-count indictment against Henley.  See A.13-19.  Count One accused Henley of being a convicted felon in possession of a firearm in violation of 18 U.S.C. §§922(g)(1) and 924(e).  See A.13-14. Count Two alleged that Henley had possessed with intent to distribute marijuana in violation of 21 U.S.C. §841.  See A.15.  And in Count Three, the Grand Jury charged Henley with possessing the firearm in furtherance of a drug-trafficking crime, a violation of 18 U.S.C. §924(c).  See A.16.  The state charges against Henley were nolle prosequi.  See PSR ¶51.

Initially, Henley pleaded not guilty.  See A.4, Dkt.No.20.  He then moved to suppress the marijuana found by Agent Sartori because, in his view, Agent Douglass lacked reasonable suspicion to search his house; Henley also sought suppression of the gun that police recovered upon execution of the later-issued search warrant, arguing that it was fruit of the poisonous tree.  See A.24-46.  After a lengthy suppression hearing at which Agents Douglass and Sartori testified, the district court ordered post-hearing briefing.  See A.68-217.  The parties both submitted briefs, see A.220-249, and the court denied the motion in a written opinion.  See A.3-25.

Henley then entered a conditional guilty plea to Counts Two and Three of the Indictment pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal procedure, reserving the right to appeal the denial of his motion to suppress.  See PSR ¶¶5-11.  The district court accepted Henley's guilty plea and sentenced him in February 2018.  See A.12, Dkt.No.103.  Henley appeals from the judgment of conviction only.  See A.1.

11

## SUMMARY OF ARGUMENT

Henley, at all relevant times a parolee, insists that the totality of the circumstances did not support reasonable suspicion to warrant entry into his home. See A.14-26. The Court need not reach this issue because the Fourth Amendment permits totally suspicionless searches of parolees' homes. See Samson v. California, 547 U.S. 843, 857 (2006).

Even if the Court assesses Henley's argument on its merits, the record confirms that Agent Douglass had reasonable suspicion that he had engaged in criminal activity or otherwise had violated some term of his parole. See United States v. Baker, 221 F.3d 438, 443-44 (3d Cir. 2000). Douglass had ongoing, credible information that Henley was dealing marijuana. See A.133-34; see also SA.41. This intelligence was corroborated by the smell of marijuana she had detected during her October 2014 visit to Park Avenue, by the fact that Henley did not use marijuana, by his admission that the loss of his job at MPW had something to do with marijuana, and by association with other drug-dealers. See A.115-16, A.131, A.137-39, A.172, A.199-200; see also SA.40. In light of Henley's history of committing gradually more serious technical violations of other his parole conditions, this was more than enough.

Henley's objections to the "staleness" of some information that Agent Douglass relied upon and his attempt to confine reasonable suspicion to the evidence of his marijuana-dealing, see Br.13, is baseless. Even if staleness considerations obtain in the parole context, reasonable suspicion turns on the totality of the circumstances, including non-criminal but suspicious conduct. See United States v. Arvizu, 534 U.S. 266, 274 (2002). Henley's long and continuing violations gave Douglass ample reason to be suspicious.

**ARGUMENT**

I.   **HENLEY, A PAROLEE, HAS NOT SHOWN THAT THE DISTRICT COURT ERRED IN DENYING HIS MOTION TO SUPPRESS THE GUN AND MARIJUANA SEIZED AFTER A SEARCH OF A HOME HE HAD BOUGHT SURREPTITIOUSLY.**

Henley argues that his long and ongoing pattern of parole violations did not give rise to reasonable suspicion to search his home, even when read in light of the other circumstances known to Agent Douglass as well as her extensive experience. <u>See</u> Br.14-26.   Though Henley engages in a divide-and-conquer rhetorical strategy in which he ignores or downplays all of the bases for Douglass's suspicion except for those which he deems "fresh" evidence of marijuana-dealing, see Br.18-26, that is not the standard that this Court must apply.  <u>See</u> <u>Arvizu</u>, 534 U.S. at 274-75.  A review of the record through the lens of the correct standard confirms that the district court correctly denied Henley's motion to suppress.

Generally, the Fourth Amendment requires government officials to establish probable cause and obtain a warrant prior to conducting a search or seizure.  <u>See</u> U.S. Const. Amend. IV.  But one well-established exception to the warrant requirement is the parole-probation exception.  Probationers and parolees "do not enjoy the absolute liberty to which every citizen is entitled, but only [...] conditional liberty properly dependent on observance of special [...] restrictions."  <u>See</u> <u>Griffin v. Wisconsin</u>, 483 U.S. 868, 874 (1987) (citation omitted); <u>see also</u> <u>United States v. Hill</u>, 967 F.2d 902, 909 (3d Cir. 1992) (holding that "<u>Griffin</u>'s reasoning applies equally to the parole system").

At the outset, it bears emphasis that "evidence obtained in accordance with federal law is admissible in federal court --- even though it was obtained

13

by state officers in violation of state law." <u>United States v. Rickus</u>, 737 F.2d 360, 363-64 (3d Cir. 1984). More recently, the Supreme Court has concluded that the Fourth Amendment does not forbid police suspicionless searches of parolees. <u>See</u> <u>Samson</u>, 547 U.S. at 857. Thus, Henley's contention that Agent Douglass lacked reasonable suspicion is beside the point: for under federal law, which governed here, she could have searched a parolee or his home **without any suspicion whatsoever**, notwithstanding that Pennsylvania law would require it. <u>Cf.</u> <u>United States v. Gay</u>, 724 F. App'x 122, 125 n.1 (3d Cir.) (unpublished) (recognizing this argument but declining to reach it where reasonable suspicion for a Pennsylvania parole search was established), <u>cert. denied</u>, 138 S. Ct. 2665 (2018).

But even if this Court declined to apply <u>Samson</u>, certainly no more than reasonable suspicion was required to search Henley's home. <u>See</u> <u>Baker</u>, 221 F.3d at 443-44. As this Court has explained:

> [Reasonable suspicion is a] less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

<u>United States v. Valentine</u>, 232 F.3d 350, 353 (3d Cir. 2000) (citation and internal quotation marks omitted). The reasonable suspicion standard controls where, as here, a parolee consents to warrantless searches of his residence by parole officers. <u>See</u> <u>Baker</u>, 221 F.3d at 448. Henley admits as much. <u>See</u> Br.15-16, 28 (citing 61 Pa. C.S. §6153).

Whether "reasonable suspicion" exists is determined from the totality of the circumstances known to the agents at the time of the search, giving "due weight" to the factual inferences and deductions drawn by the officers based

14

on their experience and specialized training.  See United States v. Johnson, 93 F. App'x 416, 418 (3d Cir. 2004) (unpublished) (quoting Arvizu, 534 U.S. at 273-74); see also United States v. Navedo, 694 F.3d 463, 473 (3d Cir. 2012) (observing that reasonable suspicion is gauged by taking the "facts together with all reasonable inferences").  A parole officer has reasonable suspicion if, under the totality of the circumstances, she has "a particularized and objective basis [for] suspect[ing]" that the defendant has either committed a new crime or violated a term of his parole.  See United States v. Williams, 417 F.3d 373, 376 (3d Cir. 2005); see also Shea v. Smith, 966 F.2d 127, 133 (3d Cir. 1992).  Even outside the parolee-probationer context, the reasonable-suspicion standard "is not particularly rigorous": no "law need actually have been broken" and the officer need not "be correct regarding the facts."  See United States v. Fleetwood, 235 F. App'x 892, 895-96 (3d Cir. 2007) (unpublished) (discussing United States v. Delfin-Colina, 464 F.3d 392, 396 (3d Cir. 2006)).

Of course, the events giving rise to Henley's appeal did not occur **not** outside the probationer-parolee context, but squarely within it.  And that context matters.  As a unanimous Supreme Court has stated:

> [I]t must be remembered that the very assumption of the institution of probation is that the probationer is more likely than the ordinary citizen to violate the law.  The recidivism rate of probationers is significantly higher than the general crime rate.  And probationers have even more of an incentive to conceal their criminal activities and quickly dispose of incriminating evidence than the ordinary criminal because probationers are aware that they may be subject to supervision and face revocation of probation, and possible incarceration, in proceedings in which the trial rights of a jury and proof beyond a reasonable doubt, among other things, do not apply[.]

See United States v. Knights, 534 U.S. 112, 120 (2001) (citations and quotation marks omitted).  Because of the probationer's or parolee's history

15

and the consequences if he backslides, there is "the concern, quite justified, that he will be more likely to engage in criminal conduct than an ordinary member of the community."    Id. at 121.    From these observations, circumstances which might only be mildly suspicious when they occur around a presumptively law-abiding member of society can be much more suspicious in the eyes of experienced parole officers who know that a parolee is at the center of them.    Because Agent Douglass knew that Henley was not a presumptively law-abiding citizen but a parolee, the reasonable-suspicion calculus must include this important background fact.

Measured against those standards, the "numerous interlocking bases" for Agent Douglass's suspicion easily rose to the level of reasonable suspicion, see Baker, 221 F.3d at 444, as the district court found.  See A.9. Douglass had ongoing, credible information from at least one confidential informant that Henley sold marijuana, see A.133-34, A.199-200; see also SA.41: information which, while insufficient by itself, "was sufficiently bolstered by the other circumstances she testified about."  See A.10.  As the court explained, those circumstances included the smell of marijuana Douglass detected during her October 2014 visit, Henley's admission that he had been fired from MPW because he supposedly tested positive for marijuana in an employer-administered test, his association with Quienty and Bell --- two other felons Douglass believed were dealing drugs --- and his access to more money than could be explained by his legitimate employment. Compare A.10-14.  The record supports those findings fully.  See A.115-16, A.119-25, A.131-39, A.172, A.181, A.186, A.199-200; see also SA.40.  In light of the inferences that Douglass logically could draw from the experience she gained during her 25-year tenure as a parole officer, see Johnson, 93 F.

16

App'x at 418, this supported her belief that Henley's house might contain evidence of marijuana-trafficking or another parole violation, see <u>Williams</u>, 417 F.3d at 376: particularly given that the reasonable-suspicion standard "is not particularly rigorous." <u>See</u> <u>Fleetwood</u>, 235 F. App'x at 895-96.

The foregoing answers Henley's contention that Agent Douglass lacked "specific, reliable, objective evidence that marijuana or any other evidence of a parole violation was likely to be present" in his home on February 23, 2015. <u>See</u> Br.13. But Henley is not done. Unable to make headway attacking the sufficiency of the evidence supporting Douglass's suspicions, Henley levels two criticisms of its weight or quality. First, and atmospherically, Henley attacks the individual bases for Douglass's suspicions piecemeal, arguing that, when viewed severally, they are either irrelevant to her specific belief that evidence of marijuana-dealing would be found in his house or are inadequate to support that belief if viewed in isolation. <u>See</u> Br.18-26. And second, Henley makes a staleness argument, complaining that incidents occurring months or years earlier were too attenuated to support Douglass's suspicions in February 2015. <u>See</u> Br.18-21. These arguments misstate the record and misconstrue the relevant legal standard.

It is well-established that the staleness doctrine applies when determining whether the information included in a search warrant affidavit is too old to support a finding of probable cause. <u>See</u> <u>United States v. Harvey</u>, 2 F.3d 1318, 1322 (3d Cir. 1993). But it is an open question whether, and to what extent, the staleness doctrine applies in the context of warrantless parole searches subject only to the reasonable-suspicion standard. <u>See</u> <u>United States v. Riley</u>, 706 F. App'x 956, 961 n.1 (11th Cir. 2017) (unpublished) (noting that the Supreme Court has never applied the doctrine in the context of

warrantless probationary searches), <u>cert. denied</u>, 138 S. Ct. 699 (2018). While this Court apparently has assumed that the staleness doctrine does apply to warrantless parole searches, it has only so held in non-precedential decisions. <u>See</u> <u>United States v. Lynch</u>, 459 F. App'x 147, 150 (3d Cir. 2012) (unpublished); <u>see also</u> <u>United States v. Eggleston</u>, 243 F. App'x 715, 718 (3d Cir. 2007) (unpublished); <u>United States v. Strickland</u>, 237 F. App'x 773, 778-79 (3d Cir. 2007) (unpublished).

A strong argument can be made that the staleness doctrine should **not** apply in assessing reasonable suspicion for probation or parole searches, at least not to the same extent that it applies in evaluating probable cause for a search-warrant affidavit. For Fourth-Amendment purposes, "the relationship between the parole officer and his parolee is 'special' and 'sui generis.'" <u>See</u> <u>United States v. Hill</u>, 967 F.2d 902, 910 (3d Cir. 1992) (citation omitted). One important feature of that relationship is the discretion it gives the parole officer to take a "wait-and-see" approach and refrain from seeking revocation based on early violations. <u>See, e.g.</u>, <u>United States v. Toliver</u>, 183 F. App'x 745, 749 n.4 (10th Cir. 2006) (unpublished). It is not a due-process violation to seek revocation of parole based in part upon conduct occurring more than a year before the violation that amounted to the last straw. <u>See</u> <u>Jones v. Johnson</u>, 230 F.3d 825, 828 (5th Cir. 2000). Consistent with this principle, it stands to reason that officers may take the less-drastic step of conducting a pre-revocation parole search based, at least in part, on conduct that occurred months earlier. To hold otherwise might force parole officers to conduct searches after every nontechnical violation, even when their better judgment would counsel that they "wait and present cumulative evidence" of violations to the court, as they are entitled to do if they see fit. <u>See</u> <u>United States v.</u>

Hamilton, 708 F.2d 1412, 1415 (9th Cir. 1983). Even entertaining the dubious assumption that parole officers have the resources to search parolees' homes after every single violation, that result might hamper the all-important development of rapport and trust between officer and parolee and chill the very forthrightness that is necessary for the relationship to flourish. That consequence would seem counter-productive to the premise that parole officers' "relationship with parolees is more supervisory than adversarial." See Pa. Bd. of Prob. & Parole v. Scott, 524 U.S. 357, 368 (1998).

But even if some form of the staleness doctrine applies to parole searches, the question becomes whether the evidence critical to Agent Douglass's decision to search Henley's house was "too old" to support reasonable suspicion. See Harvey, 2 F.3d at 1322. Age alone does not resolve this question, however. See United States v. Vosburgh, 602 F.3d 512, 529 (3d Cir. 2010). Instead, this Court must examine, on a case-by-case basis, the nature of the crime and the type of evidence sought. See United States v. Zimmerman, 277 F.3d 426, 434 (3d Cir. 2002). An assessment of Douglass's reasonable suspicion "is not merely an exercise in counting the days or even months between the facts relied on" and her search of Henley's home; rather, this Court "must also examine the nature of the crime and the type of evidence." See Harvey, 2 F.3d at 1322. Where "the facts suggest that the activity is of a protracted and continuous nature," staleness is less of an issue. See United States v. Yusuf, 461 F.3d 374, 391 (3d Cir. 2006) (citations omitted). "Narcotics investigations," in particular, "are often necessarily protracted in nature and, as such, rely on older information." See United States v. Yokshan, 432 F. App'x 170, 173 (3d Cir. 2011) (unpublished) (citing United States v. Tehfe, 722 F.2d 1114, 1119 (3d Cir. 1983)).

Here, Agent Douglass explained why she suspected that Henley was involved in trafficking marijuana on a sizeable scale on an "ongoing" basis. See A.133-34, A.199-200; see also SA.41. But confidential or anonymous informants were not the only bases for that suspicion. Mindful of Henley's history of violating conditions of supervision and of associating with other known criminals, and shortly after Bell lied about Henley's whereabouts, see A.116-31, Douglass discovered Henley living at an unauthorized address too opulent for his legitimate income, and detected such a strong odor of what she concluded must have been "at least half a pound" of marijuana hidden there. See A.137-39. This supplied reasonable suspicion. See United States v. Collins, 683 F. App'x 683 F. App'x 776, 779 (11th Cir. 2017) (unpublished) (finding reasonable suspicion to search the house of a probationer with a history of violating conditions and associating with criminals where, after others misrepresented the probationer's whereabouts, officers smelled marijuana at his house).[4]

---

[4] Henley insists "no convincing explanation was offered as to why Agent Douglass failed to immediately search" his house on October 31, 2014. See Br.23. Douglass obtained permission to conduct the search in the wake of that incident, but it kept being deferred because of limited staff resources and because of a spate of higher-priority parole violations involving heroin and guns. See A.113-14, A.199-203. That this explanation fails to convince Henley is beside the point: the district court did not reject this (or any) aspect of Douglass's testimony, see A.11-18, and the record fully supports it. If a decision to defer revoking a parolee's supervision in response to a violation may be reasonable, see Jones, 230 F.3d at 828, perforce it may be reasonable to hold off on the less-drastic step of conducting a parolee search. Nowhere does Henley suggest that, if Douglass's uncontradicted explanation is believed, it was unreasonable for her to defer the search of his house because of a staffing shortfall. See Morrissey v. Brewer, 408 U.S. 471, 479 (1972) (counseling deference to a parole officer's discretion).

Henley's initial strategy is paraleptic: to clear the way for his staleness argument, he undertakes a divide-and-conquer discussion of the evidence that Agent Douglass had at her disposal before the February 2015 search, arguing that it is unclear whether the "street" information forming the backdrop of her suspicions originated with anonymous tipsters or confidential informants. See Br.25. Douglass's testimony suggested that confidential informants --- other parolees whose names she knew but did not reveal --- supplied her "ongoing" information. See A.133-34, A.199-200. Even if anonymous, these tips were corroborated by other information. No more was necessary. See, e.g., United States v. Marcano, 508 F. App'x 119, 122 (3d Cir. 2013) (unpublished) (finding reasonable suspicion to support parole search where anonymous tip was corroborated by officer's observations); see also United States v. Ball, 282 F. App'x 126, 128 (3d Cir. 2008) (unpublished) (same, where anonymous tip that parolee was dealing drugs was coupled with earlier parole violations, even though those other violations involved drug use rather than drug dealing). That corroboration distinguishes this case from United States v. Perminter, No.10-204, 2012 WL 273349 (W.D. Pa. Jan. 30, 2012), the district court decision on which Henley relies. See Br.25-26.

Next, Henley suggests that Agent Douglass had to be "qualified" to detect the smell of marijuana. See Br.22. This assertion is not even supported by the lone Pennsylvania case he cites, which dealt with an entirely different kind of contraband. See Br.22-23 & n.2. The United States is unaware of any authority for the proposition that probation officers' olfactory acumen must be qualified as though they were drug-sniffing canines. The available authority is to the contrary. Because "marijuana has a distinctive pungent odor," United States v. Pond, 523 F.2d 210, 213 (2d Cir. 1975), the scent of it

alone may establish reasonable suspicion.  See United States v. Hayes, 603 F. App'x 74, 76 (3d Cir. 2015) (holding that the smell of marijuana alone provided reasonable suspicion for U.S. Postal Service employees to remove a parcel from the mail stream, even though none of the employees who reported smelling marijuana had established his or her qualifications to detect it by scent alone).  Henley offers nothing to support the conclusion that Douglass, a parole agent with 25 years of experience, was so unfamiliar with the smell of marijuana that she could confuse it for the smell of a skunk.

Last, Henley argues that "most of the laundry list" of suspicious behaviors to which Agent Douglass attested was "irrelevant to the question […] whether he was likely to have marijuana in his home on February 23, 2015."  See Br.21-22 (citing Baker).  Baker held in part that a parolee's use of an unauthorized vehicle did not support a reasonable suspicion that evidence of "other, unspecified, unrelated parole violations" might in the trunk.  See Baker, 221 F.3d at 445.  While Baker offers several helpful points of law, ultimately it is factually distinguishable from Henley's situation.  The parole violation that Douglass suspected was specific: she thought he was "selling a lot of marijuana."  See A.199.  Apart from the marijuana-specific evidence Douglass had, the evidence that Henley spent more money than he earned, lied to her, and associated with known criminals all tended to bolster her suspicions, at least circumstantially.  See A.115-19, A.128-30. A.132-33, A.137, A.170-73, A.184-85, A.203, A.218.  Henley's efforts to dismiss this evidence as wholly "irrelevant," see Br.22, cannot be squared with the law.[5]

_____

[5] See, e.g., United States v. Fisher, 322 F. App'x 207, 209 (3d Cir. 2009) (unpublished) (finding that a parole officer had reasonable suspicion when "the combination of events" he observed, including "implausible" statements

Having addressed Henley's piecemeal attacks on the individual bases for Agent Douglass's suspicions, all that remains is his overarching argument that the collective case against him was stale by February 23, 2015. Conceding that staleness is "not a problem" when the suspected criminal activity is "protracted and ongoing," Henley suggests that drug-activity cannot possibly be "protracted and ongoing" unless it has been "going on continuously for years." <u>See</u> Br.20. In so arguing, Henley confuses a sufficient condition for a necessary one. While a multi-year drug-conspiracy is **sufficient** to qualify as "continuous," see <u>United States v. Williams</u>, 124 F.3d 411, 420 (3d Cir. 1997), this Court never has held that a years-long pattern of conduct is **necessary**. To the contrary, it has found evidence fresh even where the drug-trafficking activity only spanned "a period of months" and where the last suspicious conduct occurred "weeks" before a search. <u>See</u> <u>United States v. Caple</u>, 403 F. App'x 656, 659 (3d Cir. 2010) (unpublished). The lone 43-year-old Pennsylvania state court opinion that Henley cites, see Br.23, has never been cited by this Court for any proposition and it does not reflect the law of this Circuit: which appears to presume that because drug-trafficking is a livelihood, it is the kind of conduct that is "continuous and

---

and evasive behavior by the parolee, "create[d], rather than alleviate[d], supervisory concerns"); <u>see also</u> <u>United States v. Johnson</u>, 93 F. App'x 416, 419 n.3 (3d Cir. 2004) (unpublished) (noting that parole officers' knowledge that a parolee had lied to them provided reasonable suspicion); <u>United States v. Alston</u>, 626 F.3d 397, 402 (8th Cir. 2010) (explaining that a probationer's known association with a drug dealer provided reasonable suspicion for a search); <u>United States v. Carter</u>, 566 F.3d 970, 975 (11th Cir. 2009) (holding that reasonable suspicion supported a probation search where the probationer "appeared to live well beyond his means").

protracted" for staleness purposes.  See United States v. Cintron, 243 F. App'x 676, 679 (3d Cir. 2007) (unpublished) (citing Tehfe, 722 F.2d at 1119).[6]

Even if continuity and protraction may not be assumed, however, in Henley's case Agent Douglass had particular reasons for continuing to believe that evidence of drug trafficking would be found in Henley's house four months after she first smelled marijuana there in October 2014.  As Douglass knew by October 2014, Henley appeared to be spending more money on vehicles and a newly-remodeled house full of new furniture than he legitimately could be earning at his $11-per-hour part-time job at MPW.  See A.132-33, A.137, A.173, A.184-85, A.218.  By January 2015, Douglass learned that Henley had been fired from his job at MPW: a fact that made it even more likely that, if he had been selling marijuana in October 2014, he would continue to do so in February 2015.  See A.171-72.  And Henley's explanation that he had been fired for failing a drug test bolstered Douglass's suspicion in two ways: first, because it linked him to marijuana; and second,

---

[6] Several courts have recognized that drug trafficking is, for staleness purposes, continuous by definition.  See, e.g., United States v. Tiem Trinh, 665 F.3d 1, 14 (1st Cir. 2011) (noting that "[b]y its very nature, drug trafficking, if unchecked, is apt to persist over relatively long periods of time") (citation omitted); see also United States v. Ramsey, Nos. 93-30370, 93-30409, 1995 WL 241488, at *4 (9th Cir. Apr. 24, 1995) ("drug trafficking is a continuous pattern of illegal substance distribution and not just a single event").  That is why, even when full probable cause is required, it is assumed that "evidence of drug trafficking may remain in one place for weeks or months at a time."  See United States v. Roach, 582 F.3d 1192, 1202 (10th Cir. 2009) (citation omitted); accord United States v. Angulo-Lopez, 791 F.2d 1394, 1399 (9th Cir. 1986) ( "With respect to drug trafficking, probable cause may continue for several weeks, if not months, of the last reported instance of suspect activity").

because it was false.  See A.115-16, A.170-72.  So while the particular stash of marijuana that Douglass smelled in October 2014 may have been "evanescent" in the sense that Henley may have sold most or all of it by February 2015, see Br.23, Douglass reasonably could infer that he would continue acquiring marijuana, storing it at his house, and selling it: especially in light of his most recent dishonesty and his recent discharge from his job. See Tehfe, 722 F.2d at 1120 (noting that stale information can be refreshed with newer information as long as it relates back in some way to the subject of the older information).[7]  These facts, and the inferences Douglass could and did draw from them, supported the reasonable suspicion that Henley's drug activity was continuous and protracted under any definition of those words.

In sum, even if the Court reaches the merits of this appeal despite Samson, Henley has not shown that the district court erred when it found that reasonable suspicion supported the parole search of his house on February 23, 2015.  "The reasonable suspicion standard is not difficult to meet," see Kramer v. City of Jersey City, 455 F. App'x 204, 208 (3d Cir. 2011) (unpublished),

---

[7] It is also important to recall that, when Henley spontaneously alerted Agent Douglass to the "skunk infestation," Douglass did not let on that she thought he was lying.  See A.137-38.  Because Douglass's cool approach gave Henley "no prior warning that he was suspected" of keeping marijuana in his house, he was unlikely to move his marijuana-distribution off-site after her October 31, 2014 visit.  See United States v. Greany, 929 F.2d 523, 526 (9th Cir. 1991).  Given that Douglass had "no reason to believe [that Henley's drug dealing at his home had] stopped" by the time she actually conducted the search, her earlier observations were not stale.  See United States v. Gragg, 576 F. App'x 656, 658 (8th Cir. 2014) (unpublished).

and it "cannot be defeated by a so-called 'divide-and-conquer' analysis, whereby each arguably suspicious factor is viewed in isolation." See United States v. Green, 897 F.3d 173, 183 (3d Cir. 2018).  The collective facts Agent Douglass possessed --- which included not only the "ongoing" information that Henley was selling marijuana, but the strong smell of marijuana she detected when she visited his house in October 2014, Henley's spontaneous admission by January 2015 that he had been fired because of marijuana, and the evidence that Henley was deceitful, lived more lavishly than his income could support, and associated closely with other drug dealers --- all factored into Douglass's suspicion that some evidence of illegal-drug trafficking likely would be found in his house in February 2015.  See SA.9-10.  Henley's staleness argument is a non-starter: the ongoing nature of drug dealing qua drug dealing --- particularly when conducted by someone who is under- or unemployed, as Henley was in February 2015 --- meant that the evidence at least as far back as October 2014 was not stale, and even if some of it had been, it was sufficiently refreshed by more recent developments, including Henley's false statements about why he lost his job. Tehfe, 722 F.2d at 1120. Accordingly, the court properly denied Henley's motion to suppress.

## CONCLUSION

For the foregoing reasons, this Court should affirm the judgment of conviction.

Respectfully submitted,

SCOTT W. BRADY
United States Attorney

/s/ Donovan Cocas
DONOVAN COCAS
Assistant United States Attorney

26

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains ***7,472*** words, excluding those parts exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the type face requirement of Fed. R. App. P. 32(a)(5) and the type style requirement of Fed. R. App. P. 32(a)(6) because it has been prepared in proportional typeface using Microsoft Word 2010 in Times Roman 14 point font.

3.    The text of this e-brief and hard copies of it are identical.

4.    A virus check was performed on this e-brief with McAfee EndPoint Security.


<u>/s/ Donovan Cocas</u>
DONOVAN COCAS
Assistant U.S. Attorney

## **CERTIFICATE OF SERVICE**

I hereby certify that the following is a filing user and will be served electronically by the Notice of Docketing Activity.  A hard copy of this brief also was mailed to:

Giuseppe GC Rosselli
Law Office of Guiseppe GC Rosselli
660 Lincoln Avenue
Pittsburgh, PA 15202
RoselliLawPgh@gmail.com

/s/ Donovan Cocas
DONOVAN COCAS
Assistant U.S. Attorney

Dated: September 21, 2018